# United States Court of Appeals for the Federal Circuit

---

**ROYAL CROWN COMPANY, INC., DR PEPPER/SEVEN UP, INC.,**
*Appellants*

**v.**

**THE COCA-COLA COMPANY,**
*Appellee*

---

2016-2375

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 91178927, 91180771, 91180772, 91183482, 91185755, 91186579, 91190658.

---

Decided: June 20, 2018

---

LAURA POPP-ROSENBERG, Fross, Zelnick, Lehrman & Zissu, PC, New York, NY, argued for appellants. Also represented by BARBARA SOLOMON, EMILY SARAH WEISS.

BRUCE WILLIAM BABER, King & Spalding LLP, Atlanta, GA, argued for appellee. Also represented by DARYL JOSEFFER, PAUL ALESSIO MEZZINA, Washington, DC.

---

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Royal Crown Company, Inc. and Dr Pepper/Seven Up, Inc. (together, "Royal Crown") appeal a decision of the Trademark Trial and Appeal Board ("the Board") dismissing Royal Crown's opposition to the registration of The Coca Cola Company's ("TCCC") trademarks for various soft drinks and sports drinks including the term ZERO. *Royal Crown Co. v. Coca-Cola Co.* (*TTAB Decision*), Opposition No. 91178927 (Parent Case), 2016 TTAB LEXIS 234 (T.T.A.B. May 23, 2016).[1] Because we conclude that the Board erred in its legal framing of the question of the claimed genericness of TCCC's marks, and failed to determine whether, if not generic, the marks were at least highly descriptive, we vacate the Board's determination and remand for further proceedings.

## I. BACKGROUND

The Royal Crown appellants are members of the Dr Pepper Snapple Group ("DPSG"). DPSG and TCCC compete in the beverage market by manufacturing and distributing various brands of beverages, including sparkling beverages, juices, juice drinks, and ready-to-drink teas, among others. Both companies manufacture and distribute beverages that use ZERO as an element of their

---

[1]    Royal Crown appeals the Board's dismissal of Opposition Nos. 91180771 (SPRITE ZERO), 91178927 (COCA-COLA ZERO), 91186579 (FANTA ZERO, VANILLA COCA-COLA ZERO, POWERADE ZERO), 91180772 (COKE ZERO), 91190658 (VAULT ZERO), 91183482 (PIBB ZERO, COKE CHERRY ZERO, CHERRY COCA-COLA ZERO, COCA-COLA VANILLA ZERO, CHERRY COKE ZERO, COCA-COLA CHERRY ZERO), and 91185755 (COKE ZERO ENERGY, COKE ZERO BOLD, VANILLA COKE ZERO).

marks.   Multiple companies market beverages bearing ZERO as part of the brand name, including Royal Crown and TCCC.  Royal Crown sought trademark protection for two marks that include the term ZERO:   DIET RITE PURE ZERO and PURE ZERO.  Royal Crown disclaimed the term ZERO apart from the marks as a whole.  TCCC has used ZERO as an element in its marks for at least twelve different beverage products sold in the United States, including various versions of COCA-COLA ZERO and COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, VAULT ZERO, POWERADE ZERO, and FULL THROTTLE ZERO.  Many other soft drink companies have applied to register ZERO-inclusive marks for various types of soft drinks.

TCCC filed seventeen trademark applications for marks including the term ZERO with the Patent and Trademark Office ("PTO").[2]  In response to each of these applications, the PTO issued an office action requesting that TCCC disclaim the term "zero" because, in the examiner's view, the term merely "describes a feature of the applicant's goods, namely, calorie or carbohydrate content of the goods."  *See, e.g.*, J.A. 1049–51 (Office Action for Application Serial No. 78580598 for COCA-COLA ZERO).  TCCC responded by claiming that each of its marks using

---

[2]    These applications include, primarily, the marks at issue in this appeal.  TCCC also filed for trademark protection for FULL THROTTLE ZERO, Application No. 77413618, but the Board sustained Royal Crown's objection to that registration.  *TTAB Decision*, 2016 TTAB LEXIS 234, at \*48–49.  TCCC sold the FULL THROTTLE brand to a third party in 2015, and that third party has not appealed the Board's decision with respect to the FULL THROTTLE ZERO mark.  Appellee Br. 7.  This application is not at issue in this appeal.

the term ZERO had acquired distinctiveness under Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), as part of a "family of ZERO marks," and refused to disclaim ZERO. Section 2(f) permits registration of descriptive marks if the applicant proves that the mark "has become distinctive of the applicant's goods in commerce." *Id.* The PTO accepted TCCC's Section 2(f) submissions and approved the marks for publication without requiring disclaimer of ZERO.

Royal Crown filed oppositions to these marks between August 2007 and June 2009, arguing that: (1) the term ZERO was merely descriptive of attributes of the associated products and could not indicate the source of TCCC's goods, and (2) the term ZERO is generic when applied to certain beverage products and therefore cannot indicate the source of the goods. The Board sustained in part and dismissed in part Royal Crown's consolidated oppositions. *TTAB Decision*, 2016 TTAB LEXIS 234, at *1. Relevant to this appeal, the Board first examined Royal Crown's contention that ZERO is generic and that the Board should require TCCC to disclaim the term before permitting registration of these marks.

As part of its inquiry, the Board found that the proper genus of the goods is "the broad category of soft drinks (and sports and energy drinks), which encompasses the narrower category of soft drinks (and sports and energy drinks) containing minimal or no calories." *Id.* at *20. The Board then considered whether ZERO is understood by the relevant public primarily to refer to soft drinks, energy drinks, or sports drinks, particularly those drinks with zero or near zero calories. The Board found that, as there are no restrictions or limitations to channels of trade or classes of consumers, the relevant consuming public is "ordinary consumers who purchase and drink soft drinks, energy drinks, or sports drinks." *Id.* at *22. Finally, the Board noted that Royal Crown did not offer direct consumer evidence (surveys or testimony), nor did

it offer dictionary evidence linking ZERO to soft drinks. Instead, Royal Crown offered indirect evidence of competitor use of ZERO, competitor trademark applications and registrations, consumer use of ZERO, and TCCC's own use of ZERO. Based on these findings, the Board concluded that Royal Crown had failed to demonstrate that ZERO is generic for the genus of goods TCCC identified in its applications. *Id.* at *39.

The Board then assessed TCCC's claim of acquired distinctiveness in its ZERO marks. Notably, while the Board appeared to accept TCCC's concession that its use of ZERO rendered its mark descriptive, the Board did not assess whether the term was highly descriptive, rather than merely descriptive. TCCC offered evidence of its sales and advertising for ZERO products and what it described as unsolicited media coverage of its ZERO products. TCCC also submitted the deposition of Dr. Alex Simonson, who conducted a consumer survey in 2008 asking respondents if they "associated" the mark ZERO with one or more particular companies. The Board explained that Dr. Simonson's survey found that 61% of respondents associated the term ZERO with one company, but only 6% of respondents associated the control term DIET with one company. And, a majority of respondents (52%) mentioned COKE, COCA-COLA, or SPRITE when asked with which company's products they "associated" the term ZERO. Although it noted that the weight of the survey was somewhat diminished because approximately five years had passed between when the survey was conducted and the close of testimony in this proceeding, the Board concluded that the survey evidence supported TCCC's sales and advertising evidence and indicated that TCCC's ZERO marks had acquired distinctiveness. *Id.* at *45–46. The Board also found that TCCC's use of the ZERO term in connection with soft drinks was substantially exclusive, because third-party use of ZERO in a

mark for soft drinks was inconsequential given the "magnitude of TCCC's use." *Id.* at \*46–48.

Based on this evidence, the Board found that TCCC had established, by a preponderance of the evidence, that it has acquired distinctiveness in the term ZERO when used as part of a mark for soft drinks.[3] *Id.* at \*48. Although nearly all of the evidence on acquired distinctiveness addressed soft drinks, the Board concluded that evidence filed under seal showing sales and marketing expenditures for POWERADE ZERO was sufficient to justify finding acquired distinctiveness as to the term ZERO for TCCC's sports drinks as well. *Id.* The Board dismissed Royal Crown's oppositions to the applications for registration of the TCCC marks for soft drinks and sports drinks without disclaimer of ZERO.[4]

Royal Crown appeals the Board's determinations on genericness and acquired distinctiveness. We have jurisdiction over this appeal under Section 21(a)(1) of the Lanham Act, 15 U.S.C. § 1071(a)(1), and 28 U.S.C. § 1295(a)(4)(B).

---

[3] The Board concluded that TCCC did not sustain its burden to establish it had acquired distinctiveness in the term ZERO for energy drinks and sustained Royal Crown's opposition accordingly as to marks for energy drinks. *Id.* at \*48–49.

[4] TCCC opposed Royal Crown's applications to register the marks PURE ZERO and DIET RITE PURE ZERO under sections 2(a) and 2(d) of the Lanham Act, 15 U.S.C. §§ 1052(a), (d), despite Royal Crown's disclaimer of the term ZERO in both applications. The Board dismissed TCCC's oppositions, *TTAB Decision*, 2016 TTAB LEXIS 234, at \*50–56, and TCCC does not appeal this decision.

## II. DISCUSSION

Whether the Board applied the correct legal standard to the facts is a question of law. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 964 (Fed. Cir. 2015) (citing *In re Dial–A–Mattress Operating Corp.*, 240 F.3d 1341, 1345 (Fed. Cir. 2001)). We review the Board's legal determinations de novo and without deference. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002).

Whether an asserted mark is generic or descriptive is a question of fact. *Princeton Vanguard*, 786 F.3d at 964 (citing *In re Hotels.com, LP*, 573 F.3d 1300, 1301 (Fed. Cir. 2009)); *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 964 (Fed. Cir. 2007). "On appellate review of the Board's factual finding of genericness, we determine whether, on the entirety of the record, there was substantial evidence to support the determination." *Hotels.com*, 573 F.3d at 1302.

We review the Board's factual findings for substantial evidence, which requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. N.L.R.B*, 305 U.S. 197, 229 (1938). The Board's analysis must encompass the entire evidentiary record. *See Princeton Vanguard*, 786 F.3d at 970.

At the outset, because TCCC seeks registration of its ZERO-containing marks under Section 2(f) of the Lanham Act, TCCC has conceded that ZERO is not *inherently* distinctive in association with the genus of goods at issue—soft drinks, energy drinks, and sports drinks. And, TCCC thus concedes that ZERO is, to some extent, descriptive. The only relief Royal Crown seeks in its oppositions to TCCC's applications is that TCCC be required to disclaim the term ZERO. Royal Crown does not argue that, if TCCC disclaims ZERO, the marks should not be allowed. The PTO may condition registration of a larger

mark on the applicant's disclaimer of an "unregistrable component of a mark otherwise registrable." 15 U.S.C. § 1056(a); *In re Stereotaxis, Inc.*, 429 F.3d 1039, 1041 (Fed. Cir. 2005). "Disclaiming unregistrable components prevents the applicant from asserting exclusive rights in the disclaimed unregistrable terms." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015) (citing *In re Wada*, 194 F.3d 1297, 1301 (Fed. Cir. 1999)).

If the Board concludes that Royal Crown has not met its burden to demonstrate the genericness of TCCC's ZERO-bearing marks, TCCC will need to demonstrate the acquired distinctiveness of its marks—that, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1379 (Fed. Cir. 2012) (quoting *Dial-A-Mattress*, 240 F.3d at 1347). Only then can marks such as the marks TCCC claims, which TCCC has conceded are not inherently distinctive based on its Section 2(f) filings, qualify for registration on the principal register. *See* 15 U.S.C. § 1052(f); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). Where a mark sits on a sliding scale of descriptiveness impacts the burden a proposed registrant must bear with respect to its claim of acquired distinctiveness. *See In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2005) ("[T]he applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning."). In assessing acquired distinctiveness, accordingly, the Board must first determine whether the proposed mark is highly descriptive rather than merely descriptive.

The parties focused their briefing, both before the Board and on appeal, on the proper designation of the term ZERO. Royal Crown argues that this term is either generic or highly descriptive with no acquired distinctiveness. TCCC contends that ZERO is neither of those

things and that TCCC has adequately demonstrated secondary meaning for the term as used in its trademarks, i.e., that the relevant public equates the term with TCCC products.

Royal Crown appeals several portions of the Board's decision. It first challenges the Board's application of the legal framework for genericness and the Board's treatment of the evidence of record, particularly the indirect evidence Royal Crown offered to demonstrate the genericness of ZERO across the genus of goods at issue. Royal Crown contends the Board erred by discounting or disregarding evidence of the parties' use of ZERO, by discounting evidence of third-party use, registrations, and applications including ZERO, and by discounting consumer use of the term ZERO as a descriptive term for caloric content of the genus of beverages. Second, Royal Crown appeals the Board's finding that TCCC has demonstrated acquired distinctiveness in its ZERO marks, arguing that the Board erred in failing to first characterize TCCC's marks as highly descriptive, finding TCCC's use of ZERO to be substantially exclusive, and failing to explain its rationale for finding that TCCC acquired distinctiveness in its marks.

We conclude the Board erred in its legal framing of the genericness inquiry in two ways—it failed to examine whether ZERO identified a key aspect of the genus at issue, and it failed to examine how the relevant public understood the brand name at issue when used with the descriptive term ZERO. We also find that the Board should have first assessed the level of the marks' descriptiveness before determining whether TCCC satisfied its burden of establishing acquired distinctiveness. Absent such a finding, it is not possible for us to review on appeal whether the evidentiary record can support the Board's finding of acquired distinctiveness. We vacate and remand for the Board to apply the proper legal standard for genericness and, if the Board again concludes the marks

are not generic, for it to consider whether the marks are highly descriptive before assessing their acquired distinctiveness.

### A.  The Board Erred in Its Application of the Legal Framework for Genericness

A generic term "is the common descriptive name of a class of goods or services." *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 989 (Fed. Cir. 1986). A generic mark, being the "ultimate in descriptiveness," cannot acquire distinctiveness. *Id.* This is so because generic terms are "by definition incapable of indicating source," and therefore "are the antithesis of trademarks, and can never attain trademark status." *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1569 (Fed. Cir. 1987) (citing *Dan Robbins & Assocs., Inc. v. Questor Corp.*, 599 F.2d 1009, 1014 (CCPA 1979)). But "[a] mark that is merely descriptive, but not the common name of the goods, can nevertheless be registered on the Principal Register if it has become distinctive in terms of section 2(f)." *In re Northland Aluminum Prods. Inc.*, 777 F.2d 1556, 1559 (Fed. Cir. 1985).

The test for determining whether a term is generic involves a two-step inquiry: "First, what is the genus of goods or services at issue? Second, is the term sought to be registered . . . understood by the relevant public primarily to refer to that genus of goods or services?" *Marvin Ginn*, 782 F.2d at 990. "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Id.* at 989–90.

"Evidence of the public's understanding of the term may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers and other publications." *Merrill Lynch*, 828 F.2d at 1570; *see also*

*Northland Aluminum*, 777 F.2d at 1559. "In an opposition or cancellation proceeding, the opposer or petitioner bears the burden of proving genericness by a preponderance of the evidence." *Princeton Vanguard*, 786 F.3d at 965 (citing *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 641–42 (Fed. Cir. 1991)).

As noted, the Board found that the relevant genus under the first prong of the *Marvin Ginn* test is "soft drinks, sports drinks, and energy drinks." *TTAB Decision*, 2016 TTAB LEXIS 234, at *20. Royal Crown argues that the Board erred in only discussing the broad genus of drink products it identified. Royal Crown contends, instead, that ZERO should be deemed generic or highly descriptive if it clearly refers to a particular characteristic of a subset of beverages—those with few or no calories or few or no carbohydrates. As to the second prong, the parties do not dispute the Board's determination of the relevant consuming public as "ordinary consumers who purchase and drink soft drinks, energy drinks, or sports drinks." *Id.* at *22.

The primary dispute between the parties, therefore, is whether members of the relevant public primarily use or understand a designation sought to be registered to refer to the genus or category of goods or services in question. *Princeton Vanguard*, 786 F.3d at 965.

In its analysis of the relevant evidence on genericness as directed by the second *Marvin Ginn* prong, the Board examined whether the ZERO portion of the trademarks for which TCCC seeks registration is a generic name for the general types of beverages with respect to which TCCC proposes to use the marks. The Board acknowledged that TCCC's uses of ZERO and 0 "certainly convey information about the nature of its products – including primarily that they contain zero (or at least fewer than five) calories." *TTAB Decision*, 2016 TTAB LEXIS 234, at *38. But the Board concluded that Royal Crown "has not

met its burden to establish by a preponderance of the evidence that ZERO is generic for soft drinks, sports drinks, or energy drinks, even such drinks that contain no, or fewer than five, calories." *Id.* at *39.

The Board's approach was erroneous. The Board asked the wrong question in assessing the alleged genericness of the ZERO term. Specifically, the Board failed to consider that "a term can be generic for a genus of goods or services if the relevant public . . . understands the term to refer to a *key aspect* of that genus." *In re Cordua Rests., Inc.*, 823 F.3d 594, 603 (Fed. Cir. 2016) (emphasis added). We explained in *In re Cordua* that "the test is not only whether the relevant public would itself *use* the term to describe the genus, but also whether the relevant public would *understand* the term to be generic. Any term that the relevant public understands to refer to the genus . . . is generic." *Id.* at 603 (alteration in original) (quoting *In re 1800Mattress.com IP, LLC*, 586 F.3d 1359, 1364 (Fed. Cir. 2009)). We also explained that "a term is generic if the relevant public understands the term to refer to *part of the claimed genus of goods or services*, even if the public does not understand the term to refer to the broad genus as a whole." *Id.* at 605 (emphasis added).

In *In re Cordua*, we found that the term "churrasco" was generic, even for use in connection with a broad class of restaurant services, because the key public would understand the term to be referring to a specialty dish—a sub-aspect of restaurant services. *Id.* at 604. We made clear that "[t]here is no logical reason to treat differently a term that is generic of a category or class of products where some but not all of the goods identified in an application fall within that category." *Id.* at 605 (quoting *In re Analog Devices, Inc.*, 1988 WL 252496, at *3 (T.T.A.B. Mar. 21, 1988)). We pointed out, for instance, that the term "pizzeria" would be generic for restaurant services, even though the public does not understand the term to refer to the broad class of restaurants as a whole; the

public need only understand that the term refers to "a particular sub-group or type of restaurant rather than to all restaurants." *Id.*

So too here, if the public understands ZERO when used in combination with a designated beverage name to refer to a sub-group or type of beverage that carries specific characteristics, that would be enough to render the term generic. Because TCCC only seeks to use ZERO as part of combination marks, moreover, the Board may not divorce the public's perception of the term ZERO from its perception of that term as part of a beverage combination mark. *See Princeton Vanguard*, 786 F.3d at 968–69 ("[E]ven in circumstances where the Board finds it useful to consider the public's understanding of the individual words in a compound term as a first step in its analysis, the Board must then consider available record evidence of the public's understanding of whether joining those individual words into one lends additional meaning to the mark as a whole."); *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1253 (Fed. Cir. 2012) (holding that, although the Board may "ascertain the meaning and weight of each of the components that makes up the mark," it "ultimately must consider the mark as a whole and do so in the context of the goods or services at issue").

The Board here failed to consider whether the relevant consuming public would consider the term ZERO to be generic for a subcategory of the claimed genus of beverages—i.e., the subcategory of the claimed beverages encompassing the specialty beverage categories of drinks with few or no calories or few or no carbohydrates. On remand, accordingly, the Board must examine whether the term ZERO, when appended to a beverage mark, refers to a key aspect of the genus. ZERO need not be equated by the general public with the entire broad genus TCCC claims in order for the term to be generic. The Board therefore must consider whether ZERO is generic

because it refers to a key aspect of at least a sub-group or type of the claimed beverage goods. The Board must make this determination by considering the facts that the genus of goods for which TCCC seeks registration of its marks clearly encompasses zero calorie beverages as a sub-group, and that TCCC only proposed to use ZERO in combination with beverage marks that offer zero calorie versions thereof.

## B. The Board Erred in Failing to Assess the Level of the Marks' Distinctiveness

Putting aside the Board's misunderstanding of the genericness inquiry, the Board also erred in assessing whether TCCC satisfied its burden of proving acquired distinctiveness without first determining exactly what that burden was. Royal Crown clearly asserted that, even if not generic, the term ZERO when used in connection with beverages is so highly descriptive that the Board's assessment of TCCC's evidence of acquired distinctiveness must be exacting.

We have long held that "the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *Steelbuilding.com*, 415 F.3d at 1300; *see also In re Boston Beer Co.*, 198 F.3d 1370, 1373 (Fed. Cir. 1999) ("[T]he greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning." (quoting *In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 1317 n.4 (Fed. Cir. 1990))). Other circuits have held similarly. *See, e.g.*, *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 440–41 (3d Cir. 2000) (noting that, to establish secondary meaning in "a commonplace, descriptive term . . . , the evidentiary bar must be placed somewhat higher"); *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999) (holding that a descriptive mark that fell "perilously close

to the generic line . . . could be a valid trademark only with a strong showing of strong secondary meaning" (internal quotation marks omitted)); *see also* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:33 (5th ed. 2017) ("Several courts take the sensible position that, for descriptive words, the greater the degree of descriptiveness, the greater the evidentiary burden on the user to establish secondary meaning.").

Our recent decision in *In re Louisiana Fish Fry* exemplifies this sliding-scale approach. In that case, we considered the Board's decision that the would-be registrant, Louisiana Fish Fry, had failed to show that the term FISH FRY PRODUCTS had acquired distinctiveness, in part because the term was "highly descriptive" and thus Louisiana Fish Fry faced an "elevated burden to establish acquired distinctiveness." 797 F.3d at 1336. We found that substantial evidence supported the Board's conclusion of no acquired distinctiveness. *Id.* We first noted that Louisiana Fish Fry did not appeal the Board's finding that FISH FRY PRODUCTS was highly descriptive. *Id.* We then held that, "[p]articularly for a mark that is as highly descriptive like FISH FRY PRODUCTS, the Board was within its discretion not to accept Louisiana Fish Fry's alleged five years of substantially exclusive and continuous use as *prima facie* evidence of acquired distinctiveness." *Id.* at 1337.

While the Board here cited *In re Steelbuilding.com* for the general proposition that higher levels of descriptiveness require a more substantial showing of acquired distinctiveness, it never returned to this point in its discussion. Thus, it did not make any finding as to the degree of descriptiveness conveyed by the term ZERO in the marks and, as discussed in more detail below, did not assess TCCC's evidence through an exacting lens.

For this reason, the Board's finding on acquired distinctiveness must also be vacated. If it reaches the ques-

tion of acquired distinctiveness, the Board must make an express finding regarding the degree of the mark's descriptiveness on the scale ranging from generic to merely descriptive, and it must explain how its assessment of the evidentiary record reflects that finding.

### C. The Board's Treatment of the Evidentiary Record

The Board must apply the proper legal standard to the evidence presented by the parties on both the genericness and acquired distinctiveness issues on remand, focusing on the relevant public's perception of the mark as well as on any identifiable subclass of the identified genus. *Merrill Lynch,* 828 F.2d at 1569. As we noted in *Princeton Vanguard*, the Board must make its factual findings based on a review of the entire evidentiary record, and we review those findings for substantial evidence:

> [S]ubstantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion. Our review under that standard can only take place when the agency explains its decisions with sufficient precision, including the underlying factfindings and the agency's rationale.

786 F.3d at 970 (citations and internal quotation marks omitted). In addition to the Board's failure to define the burden it was imposing on TCCC regarding the evidence it presented, we note several other concerns with the Board's treatment of the evidence relevant to its task on remand.

Despite the Board's intimations otherwise, Royal Crown was not required to provide direct evidence of consumer perception to support its genericness challenge to TCCC's marks, whether from a survey, dictionary, or

otherwise. *See TTAB Decision*, 2016 TTAB LEXIS 234, at *24, *33. As noted, evidence of the public's perception may be obtained from "*any competent source*, such as consumer surveys, dictionaries, newspapers and other publications." *Northland Aluminum*, 777 F.2d at 1559 (emphasis added). Royal Crown offered numerous sources of evidence on the issue of genericness which the Board generally found to be competent, including evidence of competitive use, evidence that other companies use ZERO in combination with their own soft drink marks, third-party registrations and applications for such combined marks, and evidence of third-party and TCCC descriptive uses of "zero" and "0" on various packaging and marketing materials. *See TTAB Decision*, 2016 TTAB LEXIS 234, at *33–37 (summarizing this indirect evidence and finding it "competent, for the most part, but insufficient" (footnote omitted)). TCCC has failed to offer a case citation, nor have we found one, indicating that such evidence is categorically insufficient to support a finding of genericness.

TCCC also suggests on appeal that the Board's finding of acquired distinctiveness, especially with respect to TCCC's sales and advertising figures, supports a finding that ZERO is not generic. In concluding that Royal Crown's evidence on consumer use of ZERO was mostly competent but insufficient to prove genericness, the Board stated that the "handful of public references" Royal Crown offered failed to "establish that ordinary consumers primarily use or understand the term ZERO to refer to the genus" at issue here, particularly in light of "the context of the ubiquity of TCCC's ZERO products, which have had billions of dollars in sales since they first entered the market." *TTAB Decision*, 2016 TTAB LEXIS 234, at *37.

TCCC's argument, and the Board's position, ignore the fact that "[g]eneric terms cannot be rescued by proof of distinctiveness or secondary meaning no matter how voluminous the proffered evidence may be." *Northland*

*Aluminum*, 777 F.2d at 1558 (alteration in original) (quoting Examiner); *see also Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*, 290 F.2d 845, 847–48 (CCPA 1961) ("The examiner erred in accepting the showing of 'distinctiveness' in granting the registration because no matter what the market situation may have been as to indication of origin or secondary meaning, *the common descriptive name of the product cannot become a trademark owned exclusively by one vendor*." (emphasis added)). To the extent the Board relied on TCCC's sales and advertising figures as part of the genericness inquiry, it erred in doing so. This type of evidence may be probative of acquired distinctiveness to the extent it shows that a non-generic term has gained recognition with consumers primarily as to the source of a product. Sales and advertising figures do not, however, demonstrate that a term is not used by the public to refer to the genus of goods in question, or to a sub-group thereof.

The Board's reliance on Dr. Simonson's survey to find that TCCC had acquired distinctiveness in its ZERO marks is also troubling. As the Board acknowledged, this survey is not contemporaneous with the question of whether registration should be permitted here—Dr. Simonson conducted the survey more than five years before the close of testimony before the Board. *TTAB Decision*, 2016 TTAB LEXIS 234, at *45. But "[s]econdary meaning is a time-related concept: it exists at a specific time, in a specific place, among a specific group of people who recognize that specified matter indicates commercial origin of a specified type of product or service from one unique commercial source." 4A Callmann on Unfair Competition, Trademarks, and Monopolies § 20.23 (4th ed. 2017). "Therefore, a survey is only probative if it deals with conditions at the appropriate time." *Id.* The Board gave this survey "somewhat diminish[ed]" weight for this reason, but nonetheless used its findings to "validate[] the significant sales and advertising numbers discussed

*supra*." *TTAB Decision*, 2016 TTAB LEXIS 234, at \*45–46 (citation and internal quotation marks omitted). But, as it cannot disclose contemporary public perception, the probativeness of this survey, even merely to support other evidence, is questionable. This is particularly true in the face of Royal Crown's evidence of substantial and increased use of ZERO by third parties in connection with beverages in the intervening years.

The framing of the survey questions also reduces the probative value of the results. Simonson asked consumers whether they "associated" the term ZERO with the products of one or more companies. J.A. 9139. But this question is not sufficient to demonstrate the public's perception of the term ZERO; association does not imply that a consumer would be confused by seeing a ZERO-branded product under a different label, nor does it address what meaning consumers attach to the term ZERO. The Board's reliance on the survey evidence here at least seems inconsistent with any heightened level of inquiry, if the Board intended to apply one.

In its discussion on TCCC's opposition to Royal Crown's applications, the Board also mentioned TCCC's "ZERO family of marks." But there is no indication in the Board's opinion that it in fact made a finding that TCCC had demonstrated a family of marks. *TTAB Decision*, 2016 TTAB LEXIS 234, at \*51. And, TCCC now concedes on appeal that it does not rely on a ZERO-bearing family of marks to establish acquired distinctiveness. Appellee Br. 41. Had the Board made such a finding, moreover, application of the family of marks doctrine "requires a showing that the family feature or 'surname' is distinctive enough to trigger recognition 'in and of itself.'" *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir. 1992) (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:19, at 103 (3d ed. 1992)). Some authorities have indicated that "descriptive terms cannot constitute the common element in a

family of marks," so that "[i]t may be more accurate to say that a descriptive term can serve as a family surname only where there is a strong showing of secondary meaning in the term." *Id.* (citations omitted). Without such a finding, it is hard to see how the survey has probative value for marks which consumers failed to mention in the survey.

## III. CONCLUSION

Because the Board applied the incorrect legal standard in assessing whether TCCC's ZERO marks are generic, and did not adequately consider Royal Crown's evidence with respect thereto, we vacate the Board's dismissal of Royal Crown's oppositions on that ground. We also vacate the Board's acquired distinctiveness determination to allow it, in the first instance, to assess the nature of TCCC's burden on that point and to explain how the evidence presented meets that precise burden. We remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

No costs.