This Opinion Is a
Precedent of the TTAB

Hearing: October 9, 2019 Mailed: February 7, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Spiritline Cruises LLC*
*v.*
*Tour Management Services, Inc.*

————

Opposition No. 91224000

————

Philip Summa and Rebeca Harasimowicz of Summa PLLC
    for Spiritline Cruises LLC.

Edward T. Fenno of Fenno Law Firm, LLC
    for Tour Management Services, Inc.

————

Before Kuhlke, Shaw, and Lynch, Administrative Trademark Judges.

Opinion by Lynch, Administrative Trademark Judge:

Tour Management Services, Inc. ("Applicant") seeks registration on the Principal

Register, with a claim of acquired distinctiveness under Trademark Act Section 2(f),

15 U.S.C. § 1052(f), of CHARLESTON HARBOR TOURS, with TOURS disclaimed,

in standard characters for:

Arranging of travel tours and cruises; Boat transport; Conducting boat charters; Conducting power boat charters; Conducting sightseeing travel tours by boat; Conducting sightseeing travel tours for others; Travel tour conducting; Travel tour guide services; Yacht and boat charter services in International Class 39.[1]

Spiritline Cruises LLC ("Opposer") opposes registration of the proposed mark on grounds including that it is primarily geographically descriptive under Section 2(e)(2) of the Trademark Act, 15 U.S.C. §1052(e)(2) and lacks acquired distinctiveness.[2]

Applicant denied most of Opposer's allegations underlying the claims. Also, in its Answer Applicant asserted, but did not pursue, a number of "affirmative defenses."[3] Accordingly, we deem them all waived. *See Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1422-23 n.7 (TTAB 2014); *Alcatraz Media v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

The opposition is fully briefed, and the parties participated in an oral hearing. We sustain the opposition on the ground of primary geographic descriptiveness and lack of acquired distinctiveness and therefore do not reach any other grounds. *See Multisorb Techs., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013) ("[T]he

---

[1] Application Serial No. 86334681 was filed on July 11, 2014 based on alleged use of the mark in commerce under Trademark Act Section 1(a), 15 U.S.C. § 1051(a).

[2] In addition to the genericness claim in the original notice of opposition, the Board previously granted Opposer's motions to amend its Notice of Opposition to add a claim of non-ownership and a claim of abandonment through actions that allowed the mark to become generic. 33 TTABVUE; 26 TTABVUE.

[3] Applicant alleged as affirmative defenses: failure to state a claim; improper purpose; substantially exclusive use of the mark; lack of standing; waiver and acquiescence; and unclean hands. Some of these are not true affirmative defenses, but regardless, Applicant did not pursue any of the asserted defenses or argue them in its Brief.

Board's determination of registrability does not require, in every instance, decision on every pleaded claim").

## I. Evidentiary Record and Related Matters

The record includes the pleadings and pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the opposed application. The record also includes the following submitted by Opposer:[4]

- Discovery deposition of Robert Scribner, President of Applicant, Tour Management Services, Inc.[5]

- Opposer's First Notice of Reliance on USPTO records, a map of Charleston Harbor, and a congressional report.[6]

- Opposer's Testimony Affidavit from Christopher Butler, Office Manager of the Internet Archive, with exhibits.[7]

- Opposer's Second Notice of Reliance on prior correspondence between the parties, certain printed publications, including dictionary definitions of "Charleston," "harbor," and "tour," and official records of the South Carolina Secretary of State.[8]

---

[4] By order dated June 29, 2018, the Board granted in part a motion to strike, and excluded Opposer's Notice of Reliance at 34 TTABVUE.

[5] 35 TTABVUE; 36 TTABVUE (confidential).

[6] 37 TTABVUE.

[7] 38 TTABVUE.

[8] 39 TTABVUE. The prior correspondence is not appropriate for introduction by notice of reliance. Trademark Rule 2.122(g), 37 C.F.R. §2.122(g).

- Opposer's Testimony Declaration from William Mosteller, its Vice President and the General Manager of Fort Sumter Tours, Inc., with exhibits.[9]

- Opposer's Testimony Declaration from Ian Harris, its Director of Sales and Marketing, with exhibits.[10]

- Opposer's Third Notice of Reliance on an entry from the Columbia Gazetteer of the World and an excerpt from a published communication from the Army to Congress concerning a federal navigation project in Charleston Harbor, identifying its general location and discussing its significance as a port.[11]

- Opposer's Fourth Notice of Reliance on records from the U.S. Coast Guard National Vessel Documentation Center and from the United States Federal Communications Commission.[12]

- Opposer's Testimony Affidavit of Brian Collins, owner of Sandlapper Tours, Inc., with exhibit.[13]

- Opposer's Testimony Affidavit of Abigail Cummings, a consultant, with exhibit.[14]

- Opposer's Testimony Affidavit of Glen Appelbaum, former owner of Geechee Girl LLC, with exhibit.[15]

---

[9] 42 TTABVUE.

[10] 43 TTABVUE.

[11] 44 TTABVUE.

[12] 73 TTABVUE.

[13] 70 TTABVUE 1-6; 71 TTABVUE.

[14] 70 TTABVUE 7-11; 71 TTABVUE.

[15] 70 TTABVUE 12-16; 71 TTABVUE 555-89.

- Opposer's Testimony Affidavit of Carole Borden, co-owner of AquaSafaris, Inc., with exhibit.[16]

The record includes the following submitted by Applicant:

- Applicant's Testimony Affidavit from Rick Benthall, Director of Marketing at Boone Hall Plantation in Charleston, South Carolina, with exhibit.[17]

- Applicant's Testimony Affidavit of Thomas Doyle, III, General Manager of Palmetto Carriage Works in Charleston, South Carolina, with exhibit.[18]

- Applicant's Testimony Declaration from Robert Scribner, with exhibits.[19]

- Discovery Deposition of William Mosteller, with exhibits.[20]

- Rule 30(b)(6) Discovery Deposition of Ian Harris, with exhibits.[21]

- Rule 30(b)(6) Discovery Deposition of William Mosteller, with exhibits.[22]

- Cross-Examination Deposition of William Mosteller, with exhibits.[23]

- Cross-Examination Deposition of Christopher Butler, with exhibits.[24]

- Testimony Deposition of Joyce Lowe, Opposer's Director of Sales and Marketing, with exhibits.[25]

---

[16] 72 TTABVUE.

[17] 58 TTABVUE.

[18] 59 TTABVUE.

[19] 62-64 TTABVUE.

[20] 65-66 TTABVUE.

[21] 67 TTABVUE 279-304; 68 TTABVUE; 69 TTABVUE 5-7.

[22] 67 TTABVUE 5-278; 69 TTABVUE 8-19.

[23] 83 TTABVUE.

[24] 84 TTABVUE.

[25] 85 TTABVUE.

- Cross-Examination Deposition of Carole Borden, with exhibits.[26]

- Cross-Examination Deposition of Robin Bryan Collins, with exhibits.[27]

- Cross-Examination Deposition of Glen Appelbaum.[28]

- Cross-Examination Deposition of Abigail Cummings, with exhibits.[29]

- Cross-Examination Deposition of Ian Harris, with exhibits.[30]

Opposer and Applicant raised a number of objections, based on relevance or lack of probative value. We do not address in detail these objections, which go more to the weight rather than the admissibility of this evidence. Board proceedings are heard by Administrative Trademark Judges, not lay jurors who might easily be misled, confused, or prejudiced by irrelevant evidence. *Cf. Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."). Mindful of the objections, we have accorded this evidence whatever probative value we deem appropriate. *See Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017).

Turning to both parties' hearsay objections, we consider Internet printouts and other materials properly introduced under a notice of reliance without supporting testimony only for what they show on their face rather than for the truth of the matters asserted therein. *See* Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2);

---

[26] 86 TTABVUE.

[27] 87 TTABVUE. This is the same individual who is identified in direct testimony as "Brian Collins."

[28] 88 TTABVUE.

[29] 89 TTABVUE.

[30] 92 TTABVUE.

*Safer, Inc. v. OMS Invs., Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010). "[S]uch materials are frequently competent to show, on their face, matters relevant to trademark claims (such as public perception), regardless of whether the statements are true or false. Accordingly, they will not be excluded outright, but considered for what they show on their face." *Harry Winston, Inc.*, 111 USPQ2d at 1427-28.

Similarly, as to hearsay objections to testimony, in weighing testimony, we remain mindful of the concerns with out-of-proceeding statements being relied on to prove the truth of the matter asserted, and avoid such reliance.

We overrule Opposer's objection to and request to strike a question by Applicant's counsel during Applicant's Rule 30(b)(6) deposition of Opposer on the ground that counsel mischaracterized the witness's earlier testimony. We are well equipped to assess the testimony and the degree of accuracy of any subsequent characterization of it without resorting to striking testimony or questions.

Opposer has submitted printouts from the Wayback Machine as exhibits to the declaration of Christopher Butler, Office Manager of the Internet Archive. The Internet Archive includes "a service known as the Wayback Machine," allowing users to "surf more than 450 billion pages stored in the Internet Archive's web archive" that have been "compiled using software programs known as crawlers, which surf the Web and automatically store copies of web files, preserving these files as they exist at the point of time of capture."[31]

---

[31] 38 TTABVUE 4.

The printouts in this case show screenshots from particular websites on certain dates from the past that are indicated as archive dates on the printouts. Applicant lodges numerous objections to the Wayback Machine printouts "as lacking foundation, lacking proper authentication, hearsay, and double-hearsay" and as having limited probative value.[32]

We adopt the approach taken by a number of courts, overrule the objections, and admit the Wayback Machine evidence. *See U.S. v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011) (Wayback Machine screenshots properly introduced via "a witness to testify about how the Wayback Machine website works and how reliable its contents are"); *Foster v. Lee*, 93 F. Supp. 3d 223, 231-32 (S.D.N.Y. 2015) (holding that supporting affidavit from an employee of Internet Archive supports presentation of "relevant, authentic, non-hearsay evidence in the form of an archived webpage produced by the Wayback Machine"); *Sam's Riverside, Inc. v. Intercon Sols., Inc.*, 790 F. Supp. 2d 965, 981 (S.D. Iowa 2011) (allowing Wayback Machine screenshots authenticated by an affidavit from Christopher Butler of the Internet Archive, noting that "[o]ther courts have concluded that an affidavit from an Internet Archive employee is sufficient to authenticate screen shots taken from Archive.org"); *cf. Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014) ("[T]he district court

---

[32] 93 TTABVUE 28 (Applicant's Brief). The Wayback Machine printouts at 34 TTABVUE were excluded by prior Board order. 51 TTABVUE. The Board deemed these screenshots unacceptable because they did not bear the date the pages were accessed and therefore failed to meet the requirements of Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2) for the introduction of Internet evidence. Opposer's subsequent Wayback Machine screenshot submissions do not suffer from this same defect.

reasonably required . . . authentication by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved.").

In proceedings before the Board, Wayback Machine printouts, like other Internet webpages that display a URL and date, generally can be admissible under a notice of reliance as self-authenticating Internet evidence. *See* Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2). But supported solely with a notice of reliance, such Internet evidence would be admissible only for what it shows on its face. *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1040 (TTAB 2018). Here, however, Opposer seeks to rely on the Wayback Machine evidence in this case not only for what these pages show on their face, but also to establish that third-party websites displayed "Charleston Harbor Tours" **on various dates in the past**. Accordingly, Opposer needed to, and properly did, use appropriate witness testimony to authenticate the printouts and lay the foundation to support that intended evidentiary use.

The Wayback Machine printouts were properly authenticated and accompanied by witness testimony laying the appropriate foundation for the evidence. [33] Mr. Butler

---

[33] Prior Board cases questioning the acceptability of Wayback Machine evidence, such as *Paris Glove of Can., Ltd. v. SBC/Sporto Corp.*, 84 USPQ2d 1856 (TTAB 2007) and *Hiraga v. Arena*, 90 USPQ2d 1102, 1106 n.5 (TTAB 2009), did not involve testimony from an Internet Archive official accompanying the Wayback Machine records. Thus, Mr. Butler's testimony in this case distinguishes this situation from cases with no such evidence regarding how the underlying compilation of Wayback Machine records occurs, and what can be discerned from the records. Also, the prior cases held that printouts from the Wayback Machine, as a form of Internet evidence, lacked reliability because they were not self-authenticating under Board rules and practice at that time. However, those cases pre-dated the 2017 revision to Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e), which codified *Safer*, 94 USPQ2d at 1039, and allows Internet materials to be introduced under a notice of reliance as long as the date and

authenticated the Wayback Machine printouts attached to his affidavit at 38

TTABVUE by describing them as:

> True and accurate copies of printouts of the Internet
> Archive's records of the HTML files or PDF files for the
> URLs and the dates specified in the footer of the printout
> (HTML) or attached coversheet (PDF).[34]

*See* Fed. R. Evid. 901 (authenticity); *see also Sam's Riverside, Inc.*, 790 F. Supp. 2d at

981 (approving of other courts' conclusion that an affidavit from an Internet Archive

employee verifying that screenshots are "true and accurate copies of Internet

Archive's records" suffices to admit the screenshots).

As to the hearsay objection, to the extent the Wayback Machine printouts are

offered to show how the webpages appeared on particular dates – the "truth" of the

capture as of the archive date – Mr. Butler's testimony establishes that the printouts

qualify under the business records exception. *See* Fed. R. Evid. 801(c), 802. He

established that the printouts attached to his affidavit come from the Internet

Archive's regularly conducted activity.[35] Mr. Butler explained that the Internet

Archive's automated web crawlers surf the Internet and automatically store copies of

webpages by creating unaltered copies of webpages as they appear on a given day

(reflected on the face of the archived webpage record).[36] When a screenshot is

captured using the Wayback Machine, the screenshots will display the URL of the

---

URL are provided. Thus, the rule change supersedes the skepticism for that reason expressed in prior cases about Wayback Machine evidence.

[34] 38 TTABVUE 4.

[35] 38 TTABVUE 4.

[36] *Id.*

web page archived by the Wayback Machine along with the date the screenshot was captured by the crawler and archived.[37] And the webpages are not offered to prove the truth of any matter asserted in the underlying webpage contents, so there is no hearsay problem in that regard.

Mr. Butler's testimony provided sufficient detail to explain how the Wayback Machine archives webpages and what the records show.[38] As discussed below, other witnesses associated with the underlying webpages that were archived also provided corroborating testimony to support authenticity and the accuracy of the captures as of the dates in question.

Finally, we address Applicant's substantive objections to other witness testimony. "[T]he Board generally does not strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, the Board considers such objections when evaluating the probative value of the testimony at final hearing." *Bd. of Regents v. S. Ill. Miners, LLC*, 110 USPQ2d 1182, 1194 n.19 (TTAB 2014) (citations omitted). We therefore overrule Applicant's objections to the testimony, but will weigh its relevance, what foundation was laid for the testimony, and its strength or weakness, including any inherent limitations therein.

## II.    Standing

Opposer must prove standing by showing a real interest in the outcome of the proceeding and a reasonable basis for believing that it would suffer damage if the

---

[37] *Id*.

[38] 38 TTABVUE 4.

mark is registered. *See* 15 U.S.C. § 1063; *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (citing *Ritchie v. Simpson*, 170 F.3d 1902, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999)).

Applicant concedes, as corroborated by the record, that it and Opposer are competitors in the water-based charter or tour service industry in the Charleston, South Carolina area,[39] which is sufficient to establish Opposer's standing for a claim based on Section 2(e)(2). *Cf. Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 23 USPQ2d 1878, 1879 (TTAB 1992) (party alleging descriptiveness may establish standing by establishing its manufacture or sale of related goods), *aff'd*, 994 F.2d 1569, 26 USPQ2d 1912 (Fed. Cir. 1993); *Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987) (competitor has standing to challenge registration on genericness grounds); *Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1876 (TTAB 2011) ("[W]here, as here, the pleaded ground is that the mark sought to be cancelled is deceptive under Section 2(a), or primarily geographically deceptively misdescriptive under Section 2(e)(3), petitioners do not need to own a pending application for the mark, do not have to be using the term as a mark, or even use the term at all, in order to establish their standing").

Applicant has not contested Opposer's standing.

---

[39] 93 TTABVUE 20 (Applicant's Brief); 62 TTABVUE 11-12 (Scribner Declaration (Applicant's President), stating "I don't consider many (if any) of them to be competitors of Applicant besides Opposer").

### III. Primarily Geographically Descriptive – Lack of Acquired Distinctiveness

#### A. Geographic Descriptiveness

A mark is primarily geographically descriptive if: (1) the primary significance of the mark is the name of a place that is generally known; (2) the goods or services originate in the place identified in the mark; and (3) the relevant purchasers would associate the identified services with the place named, i.e., the public would believe that the services come from the place named. *See In re Nantucket, Inc.*, 677 F.2d 95, 213 USPQ 889, 891 (CCPA 1982); *see also In re Newbridge Cutlery Co.*, 776 F.3d 854, 113 USPQ2d 1445, 1448-49 (Fed. Cir. 2015); *In re Societe Generale des Eaux Minerales de Vittel S.A.*, 824 F.2d 957, 3 USPQ2d 1450, 1452 (Fed. Cir. 1987); *In re JT Tobacconists*, 59 USPQ2d 1080, 1081 (TTAB 2001).

It is established that Applicant's proposed mark is primarily geographically descriptive because during prosecution of the subject application, in response to a refusal to register on this basis, Applicant amended the application to include a claim of acquired distinctiveness. "Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the statute accepts a lack of [inherent] distinctiveness as an established fact." *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988); *accord Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1044-45 (Fed. Cir. 2018). But we do not forgo discussion on the degree of geographic descriptiveness. *See, e.g., Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1679-80 (TTAB 2007) (determining degree of descriptiveness even when descriptiveness already established by applicant's resort

to Section 2(f)). Rather, we address it in this case because it is helpful in laying a foundation for our discussion of acquired distinctiveness.

A primarily geographically descriptive mark may be registered if it "has become distinctive of the applicant's [services] in commerce." *See* 15 U.S.C. § 1052(f). However, the Federal Circuit has explained that "'the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning.'" *Royal Crown*, 127 USPQ2d at 1047 (quoting *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005)). We see no reason this principle could not apply in the context of geographic descriptiveness. As discussed in more detail below, this case involves a well-recognized location popularly associated with the tour services at issue, in part because many third parties use the same wording to describe their similar services. Accordingly, in view of the record in this case, we first address the degree of geographic descriptiveness of the proposed mark because it bears on Applicant's evidentiary burden under Section 2(f).

The record readily demonstrates that CHARLESTON HARBOR "is the name of a place known generally to the public." *See Newbridge Cutlery*, 113 USPQ2d at 1448-49. In fact, the place is quite well-known, and serves as a tourist destination. Testimony from numerous people in the Charleston, South Carolina tourism industry reflects their regular use of "Charleston Harbor" to refer to the harbor in

Charleston.[40] For example, Applicant's witness, Mr. Benthall, Director of Marketing at Boone Hall Plantation, testified that "[a]s part of my job, I am also regularly in contact with tourists and locals seeking to take a boat trip around Charleston Harbor."[41]

Applicant's own specimen supporting its application is a brochure that repeatedly uses "Charleston Harbor" as an apparently recognizable geographic place name, encouraging potential customers to "enjoy the sights and sounds of Charleston Harbor while you listen to live, narrated commentary,"[42] and take "non-stop tours of Charleston Harbor on our smooth-sailing tour boat."[43] Another of Applicant's brochures invites consumers to "tour Charleston Harbor on board the smooth-sailing *Carolina Belle.*"[44]

The record is replete with examples, many of which are shown and discussed further below, of third-party promotional materials referring to Charleston Harbor in connection with tourism activities such as boat tours and paddle boarding. For example, AquaSafaris's website offers "a Charleston Harbor tour by water."[45] The CharlestonFunFishing.com website promotes a boat tour with offshore fishing and

---

[40] 72 TTABVUE 4 (Borden); 70 TTABVUE 5-6 (Collins); 70 TTABVUE 15 (Appelbaum). Definitions of "Charleston" in the record highlight that it is "a seaport in SE South Carolina" and "a city and port on the Atlantic in southeastern South Carolina." 39 TTABVUE.

[41] 58 TTABVUE 5.

[42] Application Serial No. 86334681, July 11, 2014 specimen, p. 2.

[43] *Id.* at p. 5.

[44] 63 TTABVUE 33-34.

[45] 72 TTABVUE 9.

"other activities and attractions around the Charleston harbor area."[46] Opposer also introduced a chart titled "Charleston Harbor and Approaches" issued by the National Oceanic and Atmospheric Administration, dated September 7, 2016.[47] And a Columbia Gazetteer of the World entry for "Charleston Harbor" identifies it as an inlet at Charleston, South Carolina.[48]

Overall, the record reflects that CHARLESTON HARBOR describes the harbor in Charleston, South Carolina, a location that is well known, particularly for Applicant's actual and potential customers seeking tours or transportation in that place.

It is also undisputed that Applicant's services emanate from Charleston, South Carolina, and include tours of Charleston Harbor. The promotional materials of Applicant and other tour providers in the record, some of which are excerpted and discussed below, tout Charleston Harbor as the location of their services.

In assessing the degree of descriptiveness, especially because Charleston Harbor is a widely recognized place associated with the particular services at issue, and because numerous third parties in the tour and charter industry refer to Charleston Harbor, we find CHARLESTON HARBOR highly geographically descriptive in this context.

In addition to the geographic place name, CHARLESTON HARBOR, the proposed mark also includes the term TOURS, which is generic for Applicant's recited services

---

[46] 84 TTABVUE 214.

[47] 37 TTABVUE 12-14.

[48] 44 TTABVUE 7.

that focus on arranging and conducting tours.[49] The addition of TOURS to CHARLESTON HARBOR merely names the service, and because "tours" are associated with places, it contributes to the primarily geographic significance of the mark as a whole. Trademark Act Section 2(e)(2) still applies if generic matter is included if the mark as a whole retains its primarily geographic significance. *See, e.g., In re Cheezwhse.com, Inc.*, 85 USPQ2d 1917 (TTAB 2008) (NORMANDIE CAMEMBERT with CAMEMBERT disclaimed, held primarily geographically descriptive of cheese)*; In re JT Tobacconists*, 59 USPQ2d 1080, 1082 (TTAB 2001) (MINNESOTA CIGAR COMPANY primarily geographically descriptive of cigars); *In re Carolina Apparel*, 48 USPQ2d 1542, 1543 (TTAB 1998) (CAROLINA APPAREL primarily geographically descriptive of retail clothing store services). There is nothing resulting from the combination of CHARLESTON HARBOR and TOURS that alters the significance or detracts from the geographic significance of the designation as a whole.

Considered in its entirety, CHARLESTON HARBOR TOURS is primarily geographically descriptive under Trademark Act Section 2(e)(2), and highly so.

### B. Acquired Distinctiveness

Trademark Act Section 2(f) permits the registration of a primarily geographically descriptive mark "which has become distinctive of the applicant's [services] in commerce." 15 U.S.C. § 1052(f). A non-distinctive designation may acquire

---

[49] The record includes a definition of tour as "the act of moving in a predetermined manner from place to place." 39 TTABVUE 22.

distinctiveness when "in the minds of the public, the primary significance of [the] . . . term is to identify the source of the product [or service] rather than the product [or service]." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.11 (1982). When a primarily geographically descriptive term has acquired distinctiveness, it "no longer cause[s] the public to associate the [services] with a particular place but to associate the [services] with a particular source.... The geographical term no longer primarily denotes the geographic area, but with secondary meaning it primarily denotes a single source for the [services]." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 10 USPQ2d 1443, 1446 (6th Cir. 1989) (citation omitted).

Given that CHARLESTON HARBOR TOURS is highly primarily geographically descriptive, the standard for establishing acquired distinctiveness becomes commensurately high. *Royal Crown Cola*, 127 USPQ2d at 1047; *In re Bongrain Int'l Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1728 n.4 (Fed. Cir. 1990) ("[T]he greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning."); *Cf. In re Loew's Theatres, Inc.*, 769 F.2d 764, 769, 226 USPQ 865, 869 (Fed. Cir. 1985) (holding in the context of a primarily geographically deceptively misdescriptive mark that the USPTO has discretion to require additional proof of acquired distinctiveness beyond a prior registration for the same mark for closely related goods).

We assess acquired distinctiveness using the following factors:

> (1) association of the trade[mark] with a particular source
> by actual purchasers (typically measured by consumer

surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark . . . All six factors are to be weighed together in determining the existence of secondary meaning.

*In re Yarnell Ice Cream, LLC*, 2019 USPQ2d 265039, *9-10 (TTAB 2019) (quoting

*Converse, Inc. v. Int'l Trade Comm'n*, 907 F.3d 1361, 128 USPQ2d 1538, 1546 (Fed.

Cir. 2018)); *see also In re Hikari Sales USA, Inc.*, 2019 USPQ2d 111514 (TTAB 2019).

During prosecution of the subject application, Applicant claimed acquired distinctiveness solely on the basis of a declaration of five years of "substantially exclusive and continuous use" immediately preceding the date of execution of the declaration. *See* 15 U.S.C. § 1052(f) (USPTO "**may** accept as prima facie evidence …proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date" of the Section 2(f) claim) (emphasis added); *see also In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015) (noting that this statutory provision is discretionary and does not require the USPTO to accept five years' use as prima facie evidence of acquired distinctiveness).

Opposer asserts that Applicant's use during the relevant timeframe was not substantially exclusive, and Applicant contends that "the crux of the present dispute concerns whether Applicant's use of the Mark has been 'substantially exclusive'."[50] Nonetheless, Applicant also has supplemented its claim with additional evidence in

---

[50] 93 TTABVUE 8 (Applicant's Brief).

this proceeding to support its Section 2(f) claim, and Opposer introduced evidence to counter the claim. The record includes evidence under the second, third, and fourth factors set out above.

While the parties argue about the prima facie showing of acquired distinctiveness and burden-shifting, we adhere to the guidance from *Yamaha Int'l*, 6 USPQ2d at 1006:

> Since we are reviewing the entire proceeding in the PTO in which both sides presented all their evidence, filed briefs, and made closing arguments, the only relevant issue before this court on appeal, as it should have been before the board, is which party should prevail on the entire record. At this stage, evaluation of the entire record, not of the prima facie showings previously made by the respective parties, is the only issue relevant to the outcome.

*See also Grote Indus., Inc. v. Truck-Lite Co.*, 126 USPQ2d 1197, 1211 (TTAB 2018) (finding evidence sufficient to rebut the presumption of validity for the registration sought to be cancelled and noting for the opposition proceeding "the only issue relevant to the outcome is whether on the entire record" the applicant had established acquired distinctiveness). The ultimate burden of persuasion for a showing of acquired distinctiveness rests on Applicant. *Yamaha Int'l*, 6 USPQ2d at 1006.

Applicant has submitted no consumer survey or other direct evidence of consumer perception of CHARLESTON HARBOR TOURS as a source indicator for Applicant. Rather, Applicant contends that it has established the necessary showing through substantially exclusive, continuous use from 2003 to 2015, as well as through its

advertising and sales during the same timeframe.[51] Applicant introduced evidence of advertising efforts, confidential advertising expenditures and confidential sales under the mark for 2003 to 2015.[52] Applicant provides services under the mark to approximately 9,000 consumers per month "during peak tourist season."[53] Applicant's President, Mr. Scribner, also testified that from 2003 to 2015, Applicant or its predecessor has used or promoted the mark in a variety of ways listed in his declaration, including, for example, local TV and newspaper ads, magazines, rack cards, brochures, its website, third-party websites, and various tourism publications.[54] The record includes examples of Applicant's promotional materials.

Mr. Benthall of Boone Hall Plantation offered testimony for Applicant. He disclosed that Boone Hall Plantation has a "co-promotional arrangement with [Applicant] in 2008 or 2009 – advertising and selling tourist packages that include trips around Charleston Harbor with [Applicant] and visits to Boone Hall." Mr. Benthall stated that he does not "recall anyone using 'Charleston Harbor Tours' to describe any other business," and he has not seen Opposer use "Charleston Harbor Tours" to advertise its products or services.[55][56]

---

[51] 93 TTABVUE 22 (Applicant's Brief).

[52] 63 TTABVUE 7-9 (confidential).

[53] 62 TTABVUE 8.

[54] 62 TTABVUE 5-8.

[55] 58 TTABVUE 5.

[56] 58 TTABVUE 5.

Opposer counters that there has been extensive use of the wording in the proposed mark by third parties and by Opposer, and that the resulting lack of exclusivity of Applicant's use dooms its claim of acquired distinctiveness. As noted above, Opposer introduced a testimony affidavit from Christopher Butler of the Internet Archive attesting to certain Wayback Machine printouts of HTML or PDF files for webpages at the URLs displayed, as of the dates reflected on the records.[57]

Opposer relies on the Wayback Machine evidence, much of which is corroborated by witnesses associated with the webpages, to show that from 2004 to 2015, encompassing almost all of Applicant's claimed period of substantially exclusive use, third-party webpages reflect use of the wording "Charleston Harbor Tours" in connection with the same types of services identified in the subject application. The Wayback Machine records (emphasis added) include:

- Screenshots of Sandlapper Tours webpages from 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011 and 2012 that include the statement, "Let our personally guided boat charters and **Charleston harbor tours** give your group a taste of Southern cuisine and charm."[58] Screenshots from the Sandlapper Tours website from 2012, 2013, 2014 and 2015 show the heading "**Charleston Harbor Tours**" in the context of promoting "History, Nature, Sunset, and Ghost Tours of the Charleston Harbor."[59]

---

[57] 38 TTABVUE 4-161.

[58] 84 TTABVUE 78-113.

[59] 84 TTABVUE 116, 120, 123, 128, 133, 138, 143.

- Screenshots of AquaSafaris webpages from 2014 and 2015 that include a menu option for "**CHARLESTON HARBOR TOURS**" and advertise, "Enjoy **Charleston Harbor Tours** aboard: Power Yachts, Sailboats, and Fishing Vessels," as well as "make sure [to] get out on a **Charleston Harbor tour**!"[60]

- Screenshots of GeeChee Girl Charters webpages from 2011, 2012, 2013 and 2014, showing the tagline "**Charleston Harbor Tours.net**" in large font underneath the company name.[61]

- Screenshots of CharlestonFunFishing.com webpages from 2012, 2013, 2014 and 2015 describe its "Charleston boat tour services" under the heading "**Charleston Harbor Tours** & Custom Charters."[62] A representative excerpt follows:



[63]

---

[60] 38 TTABVUE 129-34; 84 TTABVUE 204-09.

[61] 38 TTABVUE 140-50; 84 TTABVUE 215-26.

[62] 38 TTABVUE 135-39; 84 TTABVUE 210-14.

[63] 38 TTABVUE 136.

- Screenshots of Charleston Paddleboard Co. webpages from 2014 and 2015 promote the "**Charleston Harbor Tour**" among the "5 Awesome Charleston Area Tours to Pick From!"[64] An exemplary excerpt follows:



[65]

- Screenshots of Opposer's webpages from 2004, 2005 refer to "your **tour of Charleston harbor**" and list "Fort Sumter Tours/Spiritline Cruises – Charleston Harbour Boat Tours and Cruises."[66] Screenshots of Opposer's website from 2005, 2006, 2007, 2008 and 2009 (example below) include the

---

[64] 38 TTABVUE 152-57; 84 TTABVUE 227-32.

[65] 38 TTABVUE 152-53.

[66] 38 TTABVUE 71-72; 84 TTABVUE 146-47.

same language along with the heading "**Charleston Harbor Tour**."[67] Screenshots of Opposer's webpages from 2009, 2010, 2011 and 2012 still use the heading "**Charleston Harbor Tour**" and refer to Fort Sumter Tours/SpiritLine Cruises as "Your Home for Charleston Harbor Boat Tours and Cruises."[68] In 2013, and in 2014 and 2015, the webpages use the heading "CHARLESTON SIGHTSEEING HARBOR TOURS."[69]


[70]

Testimony also addresses third-party use of CHARLESTON HARBOR TOURS and CHARLESTON HARBOR in connection with tour and transportation services. For example:

---

[67] 38 TTABVUE 73-87; 84 TTABVUE 148-62.

[68] 38 TTABVUE 88-99; 84 TTABVUE 163-74.

[69] 38 TTABVUE 100-128.

[70] 38 TTABVUE 82.

- Carole W. Borden, co-owner of AquaSafaris, Inc. since 1992, testified that the company "has continuously offered numerous types of Charleston Harbor tours over the years,"[71] giving "400 Charleston Harbor tours in any given year."[72] She stated that until shortly before the date of her declaration, the company described its services to prospective customers as "Charleston Harbor tours," and advertised them on a website (excerpt below), through "rack cards at many locations including local restaurants and hotels, the Charleston visitor center, and the South Carolina welcome centers on our interstate highways," the local newspaper website, and radio advertising.[73] She also confirmed that the Wayback Machine captures of the company's webpages from 2010 to 2015, attached to her declaration as Exhibit T, were fair and accurate reflections of the contents of the webpages.[74] These pages repeatedly promote "Charleston Harbor Tours," using that term both in headings and text on the webpages.

---

[71] 72 TTABVUE 4.

[72] 72 TTABVUE 5.

[73] *Id*.

[74] 72 TTABVUE 5-6; 8-25. *See also* 86 TTABVUE (cross-examination deposition).



[75]

- The affidavit of Brian Collins, owner of Sandlapper Tours, Inc., refers several times to the company's services as providing "Charleston Harbor tours."[76] He also affirmed that Wayback Machine captures of the company's webpages from 2010 to 2015 were accurate reflections of the contents of the webpages.[77] The webpage text includes the statement, "Let our personally guided boat charters and Charleston harbor tours give your group a taste of Southern cuisine and charm."[78] Sandlapper Tours' webpages also have promoted "Charleston Harbor Tours" and that the company "offer[s] History, Nature, Sunset and Ghost Tours of the Charleston Harbor."[79] The following excerpt of the Sandlapper Tours webpage, where "charleston [sic] harbor tours" appears in the last

---

[75] 38 TTABVUE 129.

[76] 70 TTABVUE 4-5.

[77] 70 TTABVUE 4-5; 71 TTABVUE (Exhibit Q). *See also* 87 TTABVUE (cross-examination deposition).

[78] 71 TTABVUE 139-73.

[79] 71 TTABVUE 174-554.

sentence, also was submitted through the testimony of Mr. Butler of the Internet Archive:



- Glen Appelbaum, formerly of GeeChee Girl LLC until 2015, testified that the company also used "'Charleston Harbour Tours.net' as a logo along with 'Geechee Girl' at the charlestonharbortours.net Web address."[81] He also affirmed that the Wayback Machine captures of the company's webpages from 2010 to 2015 were fair and accurate reflections of the contents of the webpages.[82] An excerpt stating "Charleston Harbor Tours offers privately chartered day and evening boat excursions" appears below, which also was submitted through the testimony of Mr. Butler of the Internet Archive:

---

[80] 38 TTABVUE 8.

[81] 70 TTABVUE 14.

[82] 70 TTABVUE 15; 71 TTABVUE (Exhibit S). *See also* 88 TTABVUE (cross-examination deposition).



- According to Mr. Mosteller, "[b]oth Fort Sumter Tours and SpiritLine Cruises used the terms 'Charleston Harbor tour' or 'Charleston Harbor tours' on brochures during the 1990s. Fort Sumter Tours used the terms until 1997 and SpiritLine Cruises started using the terms in 1997 and continues to do so to date."[84] His declaration details Opposer's promotional activities – sometimes undertaken in joint ventures with other companies – including website advertising on its own and third-party websites, rack cards, travel agency tickets, printed brochures, ads in Traveler magazine and Where magazine, ads in the Charleston Discovery Map, radio and TV ads, billboards, city bus wrap

---

[83] 38 TTABVUE 142.

[84] 42 TTABVUE 7.

ads, and at least two trade shows annually. He states, "We use the phrase 'Charleston Harbor tours,' or similar phrases in virtually all of our advertising."[85] Mr. Mosteller's declaration also verifies captures from the Wayback Machine.[86]

- Mr. Harris testified regarding Opposer's use of "Charleston Harbor Tour" to promote its services, stating that "[s]ince its creation [in 1986], SpiritLine has likewise used the phrase 'Charleston Harbor tours' or some similar combination (e.g., tours of Charleston Harbor, Harbor tour, etc.) in virtually all of its advertising to describe SpiritLine services to the relevant consumers."[87] He stated that "SpiritLine primarily markets its services via websites, print advertisements in third party periodicals, brochures, and trade show exhibits."[88] He further testified about specific examples of print advertising in the form of brochures and rack cards, examples of which were attached, for at least 1993, 1995, 1997, 2003, and 2014. Based on the business records attached to his declaration, he indicated the volume of particular brochures and cards that were printed for distribution in those years, from 50,000 to 100,000 of each example.[89]

---

[85] 42 TTABVUE 7-9.

[86] 42 TTABVUE 11-14.

[87] 43 TTABVUE 8.

[88] *Id.*

[89] 43 TTABVUE 5-7.

Considering the record in its entirety, we find consumers do not recognize "Charleston Harbor tours" as indicating a single source for the recited services. First, the substantially non-exclusive use of CHARLESTON HARBOR TOURS presents a serious problem for Applicant, because it interferes with the relevant public's perception of the designation as an indicator of a single source. *See, e.g.*, *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances."); *DeWalt, Inc. v. Magna Power Tool Corp.*, 289 F.2d 656, 129 USPQ 275, 279 (CCPA 1961) ("Power Shop" for woodworking saws is not substantially exclusive "in view of [Opposer's] millions of competitive and continuing uses of 'power shop.'"); *In re Gen. Mills IP Holdings II, LLC*, 124 USPQ2d 1016, 1024 (TTAB 2017) (lack of exclusivity undermines Section 2(f) claim); *Apollo Med. Extrusion Techs., Inc.*, 123 USPQ2d 1844, 1853 (TTAB 2017) (same); *Sheetz of Del., Inc. v. Doctor's Assoc. Inc.*, 108 USPQ2d 1341, 1370 (TTAB 2013) (same); *Nextel Commc'ns, Inc. v. Motorola, Inc.*, 91 USPQ2d 1393, 1408 (TTAB 2009) (same); *Target Brands, Inc. v. Hughes*, 85 USPQ2d at 1682-83 (same"); *Flowers Indus. Inc. v. Interstate Brands Corp.*, 5 USPQ2d 1580, 1588-89 (TTAB 1987) ("[L]ong and continuous use alone is insufficient to show secondary meaning where the use is not substantially exclusive.").

We reject Applicant's claim that the third-party use is inconsequential. *See L.D. Kichler Co. v. Davoil Inc.*, 192 F.3d 1349, 52 USPQ2d 1307, 1309 (Fed. Cir. 1999) (substantially exclusive use may still be shown if the evidence shows that use by others was "inconsequential or infringing"). Instead, we find that the Wayback Machine evidence and testimony[90] and the third-party testimony and corroborating documentary evidence show fairly pervasive use of the same wording in the proposed mark by others in the industry during the relevant timeframe.

Second, while the lack of substantial exclusivity alone undermines Applicant's acquired distinctiveness claim, even without that fact we would have had discretion to find Applicant's use since 2003 insufficient where, as here, the proposed mark is **highly** primarily geographically descriptive. In *Alcatraz Media*, the Board deemed the "highly descriptive" mark ANNAPOLIS TOURS and held that use even nearing 20 years "would not be sufficient to establish acquired distinctiveness." 107 USPQ2d at 1766. Given our similar determination on the highly descriptive nature of CHARLESTON HARBOR TOURS, we find that Applicant's use, though long, does not show secondary meaning. *See also In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) (affirming USPTO's decision to require more than an

---

[90] We note Applicant's attempt to question the absolute accuracy of the archived webpages, including whether images were captured on the same date as text content. *See* 93 TTABVUE 31-32 (Applicant's Brief). We considered the cross-examination questioning of the witnesses who addressed Wayback Machine evidence, and Applicant's resulting arguments. However, we find that the testimony and documents overall establish the reliability of the archived webpages for our purposes. In this case, the evidence is offered to show numerous uses of CHARLESTON HARBOR TOURS during a period of years, during which specific dates are not essential. Thus, we do not find that the cross-examination testimony or Applicant's criticisms undermine the persuasive value of the evidence as a whole.

affidavit of eight years of continuous and substantially exclusive use); *In re Kalmbach Publ'g Co.*, 14 USPQP2d 1490, 1492 (TTAB 1989) (deeming a Section 2(f) claim of more than 10 years of use insufficient for a highly descriptive mark "without specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers' perception of the asserted mark"); *In re Synergistics Research Corp.*, 218 USPQ 165, 167 (TTAB 1983) ("[W]e have consistently held that a declaration or affidavit of continuous and exclusive use as a mark for an extended period of years is insufficient in and of itself to support registrability under Section 2(f) of the Trademark Act where the term sought to be registered is highly descriptive in character").

Third, we note that while under other circumstances, the amount and manner of Applicant's advertising might have more impact, we do not find it persuasive here given the high degree to which the proposed mark is primarily geographically descriptive and the substantial evidence of comparable third-party advertising using the same wording during the same timeframe. *See In re Bost. Beer Co.*, 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir 1999) (claim based on annual sales under the mark of approximately $85 million, and annual advertising expenditures in excess of $10 million, not sufficient to establish acquired distinctiveness in view of highly descriptive nature of the mark); *In re Melville Corp.*, 228 USPQ 970, 972 (TTAB 1986) (affirming the rejection of Section 2(f) as insufficient, regardless of $70 million in advertising and $3.7 billion in revenue, given "the absence of any direct evidence that

the purchasing public has come to recognize applicant's slogan as a term identifying applicant's services").

Ultimately, we find that the evidence demonstrates that consumers would perceive CHARLESTON HARBOR TOURS not primarily as a source-indicator for Applicant, but rather as a common geographic place name accompanied by a generic term, used by different entities in the industry to refer to the origin and location of services such as those recited by Applicant.

## IV.   Conclusion

The record in this case reflects that the public would understand CHARLESTON HARBOR TOURS as primarily geographically descriptive of services such as Applicant's. We have found this wording to be primarily geographically descriptive, and to a high degree. Considering the record in its entirety, Applicant has not met its ultimate burden to establish that the wording CHARLESTON HARBOR TOURS has acquired distinctiveness under Trademark Act Section 2(f) for the services identified in the application. "Our society is better served if … highly descriptive or generic terms … remain available for use among competitors." *In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 91 (CCPA 1980).

**Decision**: The opposition is sustained based on the lack of acquired distinctiveness of Applicant's proposed primarily geographically descriptive mark. We therefore need not reach any other grounds for opposition.