Original Decision Mailed:                                   Redesignation:
February 16, 2021                                          June 8, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*In re Sausser Summers, PC*
_____

Serial No. 88626569
_____

Brent D. Sausser of Sausser Summers, PC,
    for Sausser Summers, PC.

Andrea B. Cornwell, Trademark Examining Attorney, Law Office 115,
    Daniel Brody, Managing Attorney.

_____

By the Board:

    The Board has chosen to redesignate the decision that issued on February 16, 2021 as a precedent. A copy of the decision, bearing such designation, is attached.

    The decision that issued on February 16, 2021 is also corrected as follows: On page 7, the citation of the *Guaranteed Rate* decision is corrected to read "*Guaranteed Rate*, 2020 USPQ2d 10869 at \*3." On page 11, the word "is" has been deleted in the fifth line of the full paragraph. On page 23, a closing interior quotation mark has been inserted after the word "Covfefe" in the fourth line of the second full paragraph. In note 59 on page 23, the citation of the affirmance of the *Alcatraz Media* decision has been corrected to read "565 F. App'x 900."

# # # #

This Opinion is a
Precedent of the TTAB

Mailed: February 16, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

——

Trademark Trial and Appeal Board

——

*In re Sausser Summers, PC*

——

Serial No. 88626569

——

Brent D. Sausser of Sausser Summers, PC,
    for Sausser Summers, PC.

Andrea B. Cornwell, Trademark Examining Attorney, Law Office 115,
    Daniel Brody, Managing Attorney.

——

Before Goodman, Larkin, and Lebow,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Sausser Summers, PC ("Applicant") seeks registration on the Principal Register

of the proposed standard character mark ONLINETRADEMARKATTORNEYS.COM

for "legal services" in International Class 45.[1]

The Trademark Examining Attorney has refused registration of Applicant's mark

under Sections 2(e)(1) and 2(f) of the Trademark Act, 15 U.S.C. §§ 1052(e)(1) and (f),

---

[1] Application Serial No. 88626569 was filed on September 23, 2019 under Sections 1(a) and 2(f) of the Trademark Act, 15 U.S.C. §§ 1051(a) and 1052(f), based on Applicant's claimed first use of the mark and first use of the mark since 2013, and Applicant's claim that its mark has acquired distinctiveness.

on the ground that Applicant's proposed mark is merely descriptive of the services identified in the application and has not acquired distinctiveness.

When the Examining Attorney made the refusal final, Applicant appealed and requested reconsideration, which was denied. Applicant and the Examining Attorney have filed briefs.[2] We affirm the refusal to register.

## I.   Record on Appeal[3]

The record on appeal includes Applicant's specimen of use, the pertinent portion of which we reproduce below



and the following materials:

---

[2] Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

[3] Citations in this opinion to the application record, including the request for reconsideration and its denial, are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO").

[4] September 23, 2019 Application at TSDR 3.

- Definitions of the words "online," "trademark," and "attorney" from THE AMERICAN HERITAGE DICTIONARY, the MERRIAM-WEBSTER DICTIONARY, and LEXICC US DICTIONARY, made of record by the Examining Attorney;[5]

- Third-party Internet webpages displaying the terms "online trademark attorney(s)" or "trademark attorneys online" in connection with legal services, made of record by the Examining Attorney;[6]

- Pages from Applicant's website at onlinetrademarkattorneys.com entitled "Client Testimonials," made of record by Applicant;[7]

- A webpage stating that Applicant's website received about 25,000 visits in 2019, made of record by Applicant;[8]

- The Summer 2013 edition of the University of New Hampshire Law School Alumni Magazine, in which Applicant's law firm and its proposed mark are mentioned in an article authored by one of its partners, made of record by Applicant;[9]

---

[5] January 2, 2020 Office Action at TSDR 4-9; March 9, 2020 Final Office Action at TSDR 2-10.

[6] January 2, 2020 Office Action at TSDR 10-13; August 24, 2020 Denial of Request for Reconsideration at TSDR 2-13.

[7] February 11, 2020 Response to Office Action at TSDR 2-19; August 4, 2020 Request for Reconsideration at TSDR 17-38.

[8] February 11, 2020 Response to Office Action at TSDR 20.

[9] *Id.* at TSDR 21-65.

- Wikipedia entries regarding the top level domain ".com," made of record by the Examining Attorney,[10] and the term "Clickbait," made of record by Applicant;[11]

- Listings of various domain names owned by Applicant, including onlinetrademarklawyer.com, made of record by Applicant;[12]

- Google search engine search results for the term "online trademark attorneys," made of record by Applicant;[13]

- Social media pages pertaining to Applicant's law firm and services showing the proposed mark, made of record by Applicant;[14]

- An advertisement for Applicant's services in the July 2019 edition of the *Charleston Business Magazine*, made of record by Applicant;[15]

- Pages from trademarkia.com listing the top trademark filing law firms for the years 2015-2019, made of record by Applicant;[16]

- Pages of search results from the USPTO's Trademark Electronic Search System ("TESS") database regarding applications filed by and registrations obtained by Applicant's principals, made of record by Applicant;[17] and

---

[10] March 9, 2020 Final Office Action at TSDR 11-15.

[11] August 4, 2020 Request for Reconsideration at TSDR 62-65.

[12] *Id.* at TSDR 12-15.

[13] *Id.* at TSDR 16.

[14] *Id.* at TSDR 41-44.

[15] *Id.* at TSDR 45.

[16] *Id.* at TSDR 46-58.

[17] *Id.* at TSDR 59-61.

- Claimed unsolicited media coverage of Applicant, made of record by Applicant.[18]

## II. Analysis of Refusal[19]

"To establish that a term has acquired distinctiveness, 'an applicant must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" *In re Guaranteed Rate, Inc.*, 2020 USPQ2d 10869, \*2 (TTAB 2020) (quoting *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015) (internal quotation omitted)). Applicant bears the burden of establishing that its proposed mark has acquired distinctiveness. *Id.*

"Our ultimate Section 2(f) analysis of acquired distinctiveness and determination in this case is based on all of the evidence considered as a whole." *Id.* The Federal Circuit has instructed that

> the considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the [mark] with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark.

---

[18] *Id.* at TSDR 66-122.

[19] Because Applicant elected to seek registration on the basis of acquired distinctiveness under Section 2(f), "the statute accepts a lack of inherent distinctiveness as an established fact." *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988).

*Converse, Inc. v. ITC*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018).[20] "'All six factors are to be weighed together in determining the existence of secondary meaning.'" *Guaranteed Rate*, 2020 USPQ2d 10869 at *3 (quoting *Converse*, 128 USPQ2d at 1546).

### A.   Degree of Descriptiveness of the Proposed Mark

In assessing whether ONLINETRADEMARKATTORNEYS.COM has acquired distinctiveness, we must first determine its degree of descriptiveness because "[t]he greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning." *Royal Crown Cola Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1048 (Fed. Cir. 2018) (quoting *In re Boston Beer Co.,* 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) (internal quotation omitted)). *See also Guaranteed Rate*, 2020 USPQ2d 10869 at *3; *In re Virtual Indep. Paralegals, LLC*, 2019 USPQ2d 111512, *10 (TTAB 2019). We must make "an express finding regarding the degree of the mark's descriptiveness on the scale ranging from generic to merely descriptive, and [we] must explain how [our] assessment of the evidentiary record reflects that finding." *Royal Crown Cola*, 127 USPQ2d at 1048.

---

[20] "While *Converse* concerned an appeal from a decision issued by the International Trade Commission, the Federal Circuit's clarification of the factors in determining acquired distinctiveness is equally applicable to any Board proceeding that necessitates a showing of secondary meaning." *In re SnoWizard, Inc.*, 129 USPQ2d 1001, 1005 n.8 (TTAB 2018).

Applicant does not address this threshold issue. The Examining Attorney argues that "the applied-for mark is highly descriptive of applicant's services." 9 TTABVUE 9.[21] We agree with the Examining Attorney.

"The Examining Attorney introduced evidence to prove that [ONLINETRADEMARKATTORNEYS.COM] is merely descriptive and has not acquired distinctiveness in the form of dictionary definitions of the component words and third-party uses" of the term or a close variant. *Guaranteed Rate*, 2020 USPQ2d 10869 at *3. She established the mere descriptiveness of the proposed mark for "legal services" based on dictionary definitions of "online" ("[a]ccessible via a computer or computer network"),[22] "trademark" (a "name, symbol, or other device used to identify and promote a product or service, especially an officially registered name or symbol that is thereby protected against use by others"),[23] and "attorney" (a "person who is legally qualified and licensed to represent a person in a legal matter, such as a transaction or lawsuit"),[24] and third-party uses of "online trademark attorney(s)" or a close variant, such as those displayed below:

---

[21] During prosecution, the Examining Attorney twice advised Applicant that she found the proposed mark to be highly descriptive. January 2, 2020 Office Action at TSDR 1; March 9, 2020 Final Office Actin at TSDR 1. As on appeal, Applicant did not address this finding, much less contest it.

[22] January 2, 2020 Office Action at TSDR 4 (THE AMERICAN HERITAGE DICTIONARY).

[23] *Id.* at TSDR 6 (THE AMERICAN HERITAGE DICTIONARY).

[24] *Id.* at TSDR 8 (THE AMERICAN HERITAGE DICTIONARY).



EsquireTrademarks.com – Online Trademark Attorneys – What We Do:

- Our Philadelphia copyright & trademark attorney, prepares and files trademark applications for clients throughout the United States and abroad.
- We prosecute and defend trademark infringement and unfair competition actions in the Federal Courts throughout the United States and abroad.
- We also prosecute trademark office actions and appeals before the United States Trademark Office.
- We handle internet based trademark disputes and trademark, DMCA, and copyright takedowns.
- We draw on our experience as trademark litigators to guide you through the trademark process.
- We support businesses, law firms, and individuals by providing top notch legal services in intellectual property matters.

About Us: I am a trademark registration attorney that helps bloggers and influencers protect their brands. Our trademark registration lawyers will help you tailor a trademark protection strategy for your personal brand. As you can see, our online trademark attorneys work with bloggers and influencers across the country to protect their brands.

---

[25] *Id.* at TSDR 11. All highlighting in the record was supplied by the Examining Attorney.

[26] *Id.* at TSDR 12.

[27] *Id.* at TSDR 13.

Serial No. 88626569





28 August 24, 2020 Denial of Request for Reconsideration at TSDR 2.

29 *Id.* at TSDR 7.

Against the backdrop of the dictionary definitions of the words in the proposed mark and the third-party uses, the combination of the words "online," "trademark," and "attorneys" with the top-level domain ".com" immediately and unequivocally describes the key feature or attribute of the "legal services" identified in the application, namely, that Applicant provides trademark attorneys (persons "legally qualified and licensed to represent persons" in the registration and enforcement of "names, symbols or other devices used to identify and promote a product or services, especially an officially registered name or symbol that is thereby protected against use by others"), who are "[a]ccessible via a computer or computer network."[30]

Applicant described its services in this manner in the 2013 University of New Hampshire Law School Alumni Magazine article by Alexandra Spurr,[31] one of Applicant's principals, who wrote that Applicant is "a law firm that runs completely online" and "provides copyright and trademark registration services on a flat rate basis."[32] She went on to explain that "[w]ith trademark applications on the rise there is a clear need for access to experienced trademark attorneys," but that "for many of these applicants, hiring a law firm at the traditional hourly-rate, where the ultimate cost is unknown, is not a cost they can effectively budget for."[33] She noted that Applicant "recently turned to the Internet to help create a solution" and that "[b]y relying on the Internet for our online-based law firm, not only are we able to keep our

---

[30] January 2, 2020 Office Action at TSDR 4, 6, 8 (THE AMERICAN HERITAGE DICTIONARY).

[31] Ms. Spurr is also identified in the record as Alexandra or Alex Summers.

[32] February 11, 2020 Response to Office Action at TSDR 58.

[33] *Id.*

overhead low, but we also have increased the accessibility of our services to a much larger population."[34]

The immediate description of the key feature or attribute of Applicant's legal services by the proposed mark ONLINETRADEMARKATTORNEYS.COM is mirrored in the generic or highly descriptive third-party uses of the phrase "online trademark attorney(s)" to describe business models similar to that of Applicant. One competitor, FlatFeeTrademark.com, offered on its webpage displayed above "Trademark Attorney Service" that clients could "Order Online in Minutes,"[35] and another, Granite Trademark Services, on its webpage displayed above, described its "Online Trademark Attorneys" services as "replacing the traditional role and business model of trademark firms."[36]

On the basis of the dictionary definitions, third-party uses of "online trademark attorneys," and Applicant's own description of its business model, we find that "on the scale ranging from generic to merely descriptive," *Royal Crown Cola*, 127 USPQ2d at 1048, ONLINETRADEMARKATTORNEYS.COM is much closer to the generic end of the scale than to the merely descriptive end, making it highly descriptive of the "legal services" identified in the application. *See Guaranteed Rate*, 2020 USPQ2d 10869 at *3 (third-party uses of the terms "guaranteed rate," "guaranteed mortgage rate," and "guaranteed interest rate" established that claimed

---

[34] *Id.* Ms. Spurr further noted that "it is clear that consumers are now turning to the Internet to find more economically efficient ways to meet their legal needs." *Id.*

[35] August 24, 2020 Denial of Request for Reconsideration at TSDR 2.

[36] January 2, 2020 Office Action at TSDR 13.

mark GUARANTEED RATE was highly descriptive of mortgage-related services); *Virtual Indep. Paralegals*, 2019 USPQ2d 111512 at *10-11 (combination of descriptive terms "virtual," "independent," and "paralegals" in claimed VIRTUAL INDEPENDENT PARALEGALS mark for paralegal services made mark "highly descriptive of those services").

## B. Sufficiency of Evidence of Acquired Distinctiveness

Because ONLINETRADEMARKATTORNEYS.COM is highly descriptive of legal services, "Applicant's burden of establishing acquired distinctiveness under Section 2(f) is commensurately high." *Id.* at *11.

To carry this burden, Applicant may offer three basic types of evidence:

> 1. A claim of ownership of one or more active prior registrations on the Principal Register of the same mark for goods or services that are sufficiently similar to those identified in the pending application. Trademark Rule 2.41(a)(1), 37 C.F.R. § 2.41(a)(1).
>
> 2. A verified statement that the mark has become distinctive of the applicant's goods or services by reason of the applicant's substantially exclusive and continuous use of the mark in commerce for five years before the date on which the claim of distinctiveness is made. Trademark Rule 2.41(a)(2), 37 C.F.R. § 2.41(a)(2).
>
> 3. Other appropriate evidence of acquired distinctiveness. Trademark Rule 2.41(a)(3), 27 C.F.R. § 2.41(a)(3).
>
> [A]pplicant may submit one or any combination of these types of evidence. Depending on the nature of the mark and the facts in the record, the [E]xamining [A]ttorney may determine that a claim of ownership of a prior registration(s) or a claim of five years' substantially exclusive and continuous use in commerce is insufficient to establish a prima facie case of acquired distinctiveness. In which case, [A]pplicant may then submit additional other evidence of acquired distinctiveness.

*Guaranteed Rate*, 2020 USPQ2d 10869 at *2. Applicant purports to offer the latter two types of evidence here.[37]

### 1.    Substantially Exclusive and Continuous Use

Applicant declared in its application that "[t]he mark has become distinctive of the goods/services through the applicant's substantially exclusive and continuous use of the mark in commerce that the U.S. Congress may lawfully regulate for at least the five years immediately before the date of this statement,"[38] and it argues in its brief that its proposed mark "has acquired distinctiveness through substantially exclusive and continuous use of the mark in commerce for five years." 7 TTABVUE 11. The Examining Attorney responds that "the allegation of five years' use is insufficient to show acquired distinctiveness because the applied-for mark is highly descriptive of applicant's services." 9 TTABVUE 9. We agree with the Examining Attorney.

"Although Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f) , provides that the PTO may accept five years of 'substantially exclusive and continuous' use as *prima facie* evidence of acquired distinctiveness, the statute does not require the PTO to do so." *La. Fish Fry Prods.*, 116 USPQ2d at 1265. The Federal Circuit in *La. Fish Fry Prods.* noted that the applicant did "not challenge the Board's finding that the term

---

[37] Applicant claimed that its mark "had become distinctive of the goods/services as evidenced by ownership on the Principal Register for the same mark for sufficiently similar goods/services of active U.S. Registration No. 4590561," February 11, 2020 Response to Office Action at TSDR 1, but the registration is on the Supplemental Register and cannot support Applicant's Section 2(f) claim.

[38] September 23, 2019 Application at TSDR 1.

FISH FRY PRODUCTS is highly descriptive," *id.*, and that "[p]articularly for a mark that is as highly descriptive as FISH FRY PRODUCTS, the Board was within its discretion not to accept Louisiana Fish Fry's alleged five years of substantially exclusive and continuous use as *prima facie* evidence of acquired distinctiveness." *Id.*

Here, as in *La. Fish Fry Prods.*, the applicant does not dispute that the proposed mark is highly descriptive of its services, and the Examining Attorney's finding to that effect is amply supported by the record. Under the circumstances, the Examining Attorney was well within her discretion to reject Applicant's claim of five years of substantially exclusive and continuous use as insufficient to prove acquired distinctiveness. *See Virtual Indep. Paralegals*, 2019 USPQ2d 111512 at *11-12 (because proposed mark VIRTUAL INDEPENDENT PARALEGALS was "at very best, highly descriptive, we find that five years of substantially exclusive and continuous use is not sufficient to prove that VIRTUAL INDEPENDENT PARALEGALS has acquired distinctiveness"); *Real Foods*, 128 USPQ2d at 1378 (finding that Board was within its discretion not to accept five years of substantially exclusive and continuous use as sufficient evidence of acquired distinctiveness where the proposed marks were highly descriptive). We turn now to Applicant's additional evidence in support of its Section 2(f) claim.

### 2. Applicant's Evidence Under the *Converse* Factors

#### a. Association of ONLINETRADEMARKATTORNEYS.COM with Applicant by Actual Purchasers

This factor is "typically measured by customer surveys." *Converse*, 128 USPQ2d at 1546. Applicant does not offer a survey, or declarations from its clients attesting

to their association of ONLINETRADEMARKATTORNEYS.COM with Applicant. *See, e.g., In re MK Diamond Prods.*, 2020 USPQ2d 10882, \*25 (TTAB 2020) (discussing declarations from applicant's customers regarding their claimed recognition of applicant's saw blade design); *Kohler Co. v. Honda Gikken Kogyo K.K.*, 125 USPQ2d 1468, 1507-08 (TTAB 2017) (discussing statements from applicant's distributors regarding their claimed recognition of applicant's engine design). Instead, Applicant offers a listing of unsworn testimonials from 125 different clients in the United States on its website to show "association of the mark with a particular source by actual purchasers." 7 TTABVUE 13.[39] According to Applicant, "[j]ust from these testimonials alone, it shows glowing remarks from clients who associate our name with our quality trademark services in 34 states, and 17 countries." *Id.* at 12.[40]

Only a tiny fraction of Applicant's clients even mentioned, or referred to Applicant as, OnlineTrademarkAttorneys.com,[41] while a few more mentioned, or referred to Applicant as, "Online Trademark Attorneys," without the .com TLD.[42] The vast

---

[39] Applicant made two sets of testimonials of record, February 11, 2020 Response to Office Action at TSDR 2-15; August 4, 2020 Request for Reconsideration at TSDR 17-38, but a large number of the testimonials are duplicates.

[40] We have disregarded the testimonials from foreign clients. They are of no probative value because we must determine whether United States consumers associate the proposed mark ONLINETRADEMARKATTORNEYS.COM with Applicant.

[41] February 11, 2020 Response to Office Action at TSDR 3 (two separate mentions), 4, 7 (three separate mentions), 11, 15 (two separate mentions); August 4, 2020 Request for Reconsideration at TSDR 30.

[42] February 11, 2020 Response to Office Action at TSDR 3, 7, 10, 13, 15; August 4, 2020 Request for Reconsideration 20, 21, 24, 26, 30. One client used the term generically in stating that "I can't speak for **other online trademark attorneys**, but these guys are legit to trust with your business trademark." February 11, 2020 Response to Office Action at TSDR 15 (emphasis added). Another used "Online Trademark Attorneys" ambiguously as part of the phrase "Sausser Summers Online Trademark Attorneys." *Id.* at 10.

majority of the testimonials referred to Applicant by its firm names Sausser Summers and Sausser Spurr, or referred by name to Applicant's principals Brent Sausser and Alex Spurr/Summers. The testimonials suggest that Applicant's principals have a successful law practice with satisfied clients, but they do not show that consumers associate the proposed mark ONLINETRADEMARKATTORNEYS.COM exclusively with Applicant.

### b. Length, Degree, and Exclusivity of Use

Applicant argues that it has used ONLINETRADEMARKATTORNEYS.COM "in US commerce and worldwide since 2013" and that the "declaration provided herein also confirms that this use has been exclusive and continuous." 7 TTABVUE 13.[43] Applicant further argues that "the nominal use by others is merely inconsequential or infringing," *id.*, and that it "also owns all social media accounts in relation to its trademark, which adds to its exclusivity." *Id.* Finally, Applicant cites the Supreme Court's recent decision in *U.S. Patent & Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2020 USPQ2d 10729 (2020), for the proposition that "some exclusivity of use comes from simply owning and using the domain name in relation to the trademark, ONLINETRADEMARKATTORNEYS.COM." *Id.*[44]

---

[43] We assume that Applicant's reference to the "declaration provided herein" is to the five years' use declaration in its application, as no other declaration is in the record. In that regard, we note that a declaration of a knowledgeable witness setting forth the evidence relevant to the *Converse* factors is a common and useful means of proof in Section 2(f) cases.

[44] Later in its brief, Applicant cites *Booking.com* again for the propositions that "'[d]omain names are unique; that is, a given domain name is assigned to only one entity at a time," 7 TTABVUE 16 (quoting *Booking.com*, 2020 USPQ2d 10729 at *4 n.1) (emphasis added by Applicant), and that "recognition and secondary meaning 'depends on whether consumers in fact perceive that term as the name of a class or, instead, as a term capable of distinguishing among members of the class.[']" *Id.* (quoting *Booking.com*, 2020 USPQ2d 10729 at *7).

As discussed above, given the highly descriptive nature of the proposed mark, Applicant's use of it since 2013 is insufficient to prove that it has acquired distinctiveness. In that regard, we do not view the evidence of third-party use of "Online Trademark Attorneys" and close variants shown above and elsewhere in the record to be either "inconsequential or infringing." 7 TTABVUE 13. The third-party uses corroborate the inherently highly descriptive nature of the phrase "online trademark attorneys" as an identifier of attorneys who render their trademark-related legal services online.

We also find unpersuasive Applicant's arguments that the addition of the .com TLD to that highly descriptive phrase supports a finding that the mark as a whole has acquired distinctiveness. In *Booking.com*, a genericness case, the Supreme Court noted that "only one entity can occupy a particular Internet domain name at a time," *Booking.com*, 2020 USPQ2d 10729 at *6, in the course of rejecting the USPTO's argument for the application of a categorical rule that all marks consisting of a generic term and the .com TLD are ipso facto generic. The Court held that "consumers could understand a given 'generic.com' term to describe the corresponding website or to identify the website's proprietor. We therefore resist the PTO's position that 'generic.com' terms are capable of signifying only an entire class of online goods or services and, hence, are categorically incapable of identifying a source." *Id.* But that holding does not answer the question of whether a particular mark, as a whole, is generic or, in this case, merely descriptive without secondary meaning. The fact that some consumers may recognize that the .com TLD in Applicant's mark can identify

only one entity at any one time has little probative value regarding the exclusivity of Applicant's use of the mark as a whole, particularly in the face of the record evidence that multiple third parties describe their legal services as being provided by "online trademark attorneys."

### c. Advertising

Applicant argues that it engages in "vast and worldwide advertising" and "spends a substantial amount in advertising each year," 7 TTABVUE 14, but declines to disclose any figures, claiming that "it would be a significant advantage to our competitors." *Id.* Given Applicant's business model, these grandiose claims are not credible. Applicant's specimen reproduced above states that it "offers low trademark attorney flat fee services," and Ms. Spurr wrote in the University of New Hampshire Law School Alumni Magazine article that Applicant keeps its overhead low by operating solely online.[45] It strains credulity that a business striving to keep overhead low and charging low flat fees would (or even could) engage in "vast and worldwide advertising" and "spend[ ] a substantial amount in advertising each year." *Id.*[46] In the absence of supporting evidence, we cannot find that Applicant has advertised extensively.

---

[45] February 11, 2020 Response to Office Action at TSDR 58.

[46] We note that only one client who provided a testimonial stated that he located Applicant through its advertising in the form of a YouTube video. *Id.* at TSDR 11. Two clients found Applicant through Google searches, *id.* at TSDR 7, 13, another "was able to find Brent Sausser online," *id.* at TSDR 8, and another's "mother found this firm for me." *Id.* at TSDR 15.

Applicant claims that it "has advertised in print magazines, social media platforms, internet ads, and various other sources across the U.S. and in other countries" and "has placed ads via social media platforms, and places advertisements via Googleads on a daily basis," *id.*, but Applicant provides no evidence whatsoever regarding the duration and extent of exposure of any of these materials. It offers a single print advertisement in the July 2019 edition of the *Charleston Business Magazine,* a publication apparently directed to businesses located in Charleston, South Carolina, the city in which Applicant has its brick-and-mortar world address. We reproduce that advertisement below:



[47]

---

[47] August 4, 2019 Request for Reconsideration at TSDR 45. Applicant refers to the advertisement in its brief as Exhibit G, but mislabeled the advertisement as a second Exhibit F. 7 TTABVUE 15. The Examining Attorney notes that "the mark as shown in the magazine advertisement (ONLINETRADEMARK ATTORNEYS.COM separated as two words) does not match the applied-for mark (ONLINETRADEMARKATTORNEYS.COM)." 9 TTABVUE 12. We do not view the discrepancy as significant.

As Applicant acknowledges, "'[t]he ultimate test in determining whether a designation has acquired distinctiveness is applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source.'" 7 TTABVUE 15 (quoting *In re Redken Labs., Inc.*, 170 USPQ 526, 529 (TTAB 1971)). Here, we have no useful information regarding even Applicant's efforts to establish such an association through its advertising and promotion, and we cannot infer anything about its success based on its evidence under this *Converse* factor.

### d. Amount of sales and number of customers

Applicant's argument under this *Converse* factor is as follows:

> Here, as expressed above, Applicant has represented clients in 29.7% of the world. Moreover, Applicant has represented clients in 49 states and 58 countries. *See* Request for Reconsideration, Exhibit D. For the past 5 (five) years Applicant has been one of the top trademark filing law firms in the U.S. *See* Request for Reconsideration, Exhibit H (showing Applicant was one of the top trademark filing firms 2015, 2016, 2017, 2018, and 2019). Thus, Applicant has filed some of the most applications in the U.S. on an annual basis compared to other U.S. law firms.

7 TTABVUE 15. According to Applicant, "[a]ll of those applications were filed by clients who recognize and associate ONLINETRADEMARKATTORNEYS.COM with Applicant's services." *Id.*

Applicant provides neither the amount of its sales of legal services nor the number of its clients. The fact that Applicant has "represented clients in 49 states" tells us nothing about either of these metrics. Applicant may be a prolific filer of applications, but the evidence shows only that it has been recognized as such by its firm name

"Sausser Summers, P.C.",[48] not by ONLINETRADEMARKATTORNEYS.COM.[49] Moreover, as discussed above, the vast majority of the clients who gave testimonials do not "recognize and associate ONLINETRADEMARKATTORNEYS.COM with Applicant's services," 7 TTABVUE 15, but similarly identify Applicant by its firm name or by the names of its principals. We agree with the Examining Attorney that "this evidence at best shows clients' association of the firm name with applicant's services, not the applied-for mark." 9 TTABVUE 11-12.

### e.   Intentional Copying

Applicant argues that the third-party uses of "online trademark attorneys" involve attempts to trade on Applicant's goodwill in its proposed mark through the use of "clickbait," uses that are intended to "appear high in Google search results to likely confuse consumers into clicking into competitor's website." 7 TTABVUE 15. Applicant claims that its "mark has experienced intentional copying that it intends to end via trademark protection on the Principal Register." *Id*. at 16.

None of the third-party uses in the record involves Applicant's proposed mark ONLINETRADEMARKATTORNEYS.COM. Instead, as discussed and shown above, they involve the generic or highly descriptive use of the phrase "online trademark attorney(s)" to identify trademark attorneys who provide legal services online for Applicant's competitors such as FlatFeeTrademark.com, EsquireTrademarks.com,

---

[48] August 4, 2020 Request for Reconsideration at TSDR 46, 49. Applicant claimed that it "was one of the top trademark filing firms [in] 2015, 2016, 2017, 2018, and 2019," 7 TTABVUE 15, but it appears in the Top 100 Law Firms Ranking on Trademarkia only in 2018 and 2019.

[49] The instant application itself was filed in the name of "Sausser Summers, PC," not ONLINETRADEMARKATTORNEYS.COM.

and Granite Trademark Services.[50] We cannot infer from these uses that the users intended "to trade on the goodwill associated with Applicant's mark." 7 TTABVUE 16.

### f.      Unsolicited Media Coverage

Applicant's argument on this *Converse* factor is that it "has had numerous unsolicited media coverage [sic]," 7 TTABVUE 16, in the form of mentions "by consumers on Reddit, Etsy, Amazon, and [citations] by media outlets, bussinessinsider.com. cryptobriefing.com, marketswired.com, gunnewsdaily.com. vice.com, pinterest.ch, among others." *Id.* Applicant's claim is specious.

The Reddit webpage contains a hyperlink to Applicant's website, but it is not clear how it got there and why.[51] The website at crypto.com similarly provides a hyperlink to Applicant's website and quotes a statement from Applicant about the protectability of "Bitcoin" as a mark.[52]

The website at marketswired.com displays a press release by "Sausser Summers, PC" regarding Applicant's granting of a scholarship to a student at Chicago-Kent College of Law.[53] A press release is the antithesis of "unsolicited" media coverage, and

---

[50] Applicant made of record the results of a Google search engine search for the term "online trademark attorneys." August 4, 2020 Request for Reconsideration at TSDR 16. Only Granite Trademark Services was included in the results. The summaries of those results included Granite's generic or descriptive use of the phrases "online trademark attorneys" and "online trademark lawyers" in the statements "Online Trademark Attorneys. Online trademark lawyers are replacing the traditional role and business model of trademark firms" and "All work done by online trademark lawyers at our full service trademark law firm."

[51] *Id.* at TSDR 70.

[52] *Id.* at TSDR 74.

[53] *Id.* at TSDR 76-77.

Applicant's press release also identifies Applicant only by its firm name, not ONLINETRADEMARKATORNEYS.COM, including in the section entitled "About Sausser Summers, PC."

The Amazon webpages contain a discussion of a copyright issue.[54] One page states that "[v]arious lawyers websites copy/paste the same thing we shared from the CopyRight Law . . . such as this one" and contains a footnote with a hyperlink to Applicant's website.[55]

The Gun News Daily webpages discuss the sale of fake gun accessories on Amazon,[56] the Business Insider webpages contain an article entitled "From cat names to fruit, here are 11 bizarre things celebrities have tried to trademark,"[57] and the Vice webpages contain an article entitled "'Covfefe' Beer and Coffee Are Being Trademarked,"[58] but we could locate no references to Applicant in these materials.[59]

Applicant also provides no information regarding the extent of the exposure to prospective purchasers of legal services of the materials that do mention or refer to Applicant. Simply put, the record does not show meaningful media mentions of Applicant's proposed mark ONLINETRADEMARKATTORNEYS.COM.

---

[54] *Id.* at TSDR 91-92.

[55] *Id.* at TSDR 91.

[56] *Id.* at TSDR 93-98.

[57] *Id.* at TSDR 99-117.

[58] *Id.* at TSDR 118-22.

[59] Portions of these materials are missing or cut off. If those portions referred to Applicant, it was Applicant's "duty to ensure that the evidence it submit[ted] is legible." *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1758 (TTAB 2013), *aff'd*, 565 F. App'x 900 (Fed. Cir. 2014) (mem.).

### g.    Summary

Considered as a whole, Applicant's evidence on the *Converse* factors falls far short of carrying Applicant's heavy burden of showing that its highly descriptive proposed mark ONLINETRADEMARKATTORNEYS.COM has acquired distinctiveness for legal services.

**Decision**: The refusal to register is affirmed.